UNITED STATES *ex rel.* McSWEENEY *v.* FULLHART.

*(Circuit Court, W. D. Pennsylvania. September 19, 1891.)*

1. UNITED STATES MARSHALS—MAKING ARRESTS—RIGHT TO USE FORCE TO PREVENT
   RECAPTURE.
   United States deputy-marshals have full power to use all force necessary in executing process of the federal courts; and when, after having legally arrested a man, and while conveying him to prison, they are met by a company of his friends who, they have reason to believe, intend to effect a rescue, and one of whom seizes their horses' heads, they are justified in immediately pointing their revolvers at him, thus causing him to desist.

2. SAME—HABEAS CORPUS.
   When United States marshals or their deputies are arrested by state authority for using force or threats in executing process of the federal courts, the writ of *habeas corpus* will issue to effect their release.

*Habeas corpus* to release a United States deputy-marshal from imprisonment by virtue of state authority for using force and threats in preventing the recapture of a prisoner.

*Walter Lyon,* U. S. Dist. Atty., for relator.

REED, J. One Chauncy Marble was under indictment in the district court, charged with counterfeiting. He was called for trial at the session of the court held at Erie in July, 1891, and an application for continuance made in his behalf on the ground of the sickness of a material witness. After investigation the continuance was refused. On the next day, Marble, who was under bail, was not present, and his counsel stated that they had received word that he was sick at home, some 50 miles away. Two physicians made their appearance, and testified that his condition was serious, and that it would be dangerous to his health to bring him to Erie for trial. On the application of the district attorney, his bail was forfeited, and an order made that process, directed to the marshal, be issued for his arrest, which was accordingly done. At the same time another order was made, directing a physician to be taken by the marshal, to examine into the condition of the defendant, to ascertain whether he could be removed from his home at that time. The marshal placed the process in the hands of H. Baring, a regular deputy United States marshal, to execute the orders of the court, and, at the same time, deputized Daniel McSweeney, the relator, as a deputy-marshal, to assist Mr. Baring. Taking a physician from Erie, and accompanied by William McManus, an operator of the United States secret service, the two deputies went to the defendant's house. It was necessary, in order to reach it, to drive from Corry, a distance of 9 or 10 miles, passing through a small town called Columbus. The defendant was found to be in a condition which admitted of his arrest and removal, and he was brought to Erie, and the next day pleaded guilty, and was sentenced.

As the party returned to Corry, they drove across a short bridge, near the town of Columbus. At the end of the bridge quite a crowd had col-

lected, and, as the wagon approached, a man jumped out of the crowd, caught the horses, and said, "I want you fellows." Both Baring and McSweeney drew their revolvers, and, pointing them at him, told him to let go of the horses, which he did, and the party drove on. When they reached Corry the deputies were compelled to wait over night for a train, and during the evening the relator, McSweeney, and Deputy Baring were arrested upon a charge of "assaulting and pointing a gun at Frank Giffard and N. E. Dewey, constables," etc. Mr. McSweeney procured bail, and was able to proceed without further interruption to Erie with the prisoner. He has lately been surrendered into the custody of the sheriff of Warren county by his bail, and then followed the petition in this court for a writ of *habeas corpus.* A day, convenient to the district attorney of Warren county, was at his request fixed for a hearing, but, when the matter was called up, no one was present to represent the prosecution in the case against the defendant, and I have been compelled to investigate the matter without the assistance of counsel, or testimony of witness in that interest.

The extent and nature of the powers of the courts of the United States, to inquire into and pass upon the validity of prosecutions under state laws against United States officers for acts done while performing the duties imposed upon them under the laws of the United States, which acts are claimed to be violations of state laws, have lately been fully discussed and settled by the supreme court of the United States in the *Case of Neagle,* 135 U. S. 1, 10 Sup. Ct. Rep. 658. In that case it was held that a person who is in custody for an act done in pursuance of a law of the United States, or of an order, process, or decree of a court or judge thereof, or is in custody in violation of the constitution or a law or treaty of the United States, may, under the provisions of Rev. St. § 753, be brought before any court of the United States, or justice or judge thereof, by writ of *habeas corpus,* for the purpose of an inquiry into the cause of his detention; and the court or justice or judge is required by section 761 to proceed in a summary way to determine the facts of the case by hearing the testimony and arguments, and thereupon to dispose of the party as law and justice may require; that United States officers, and other persons held in custody by state authorities for acts which they were authorized or required to do by the constitution and laws of the United States, are entitled to be released from such imprisonment, and the writ of *habeas corpus* is the appropriate remedy for that purpose; that if the prisoner was held in the state court to answer for an act which he was authorized to do by the laws of the United States, which it was his duty to do as a marshal of the United States, and if, in doing that act, he did no more than was necessary and proper for him to do, he cannot be guilty of a crime under the laws of the state; that when these things are shown it is established that he is innocent of any crime against the laws of the state, or of any authority whatever; that there is no occasion for any further trial in the state court, or in any court. And in that case the petitioner, who was under arrest by state process, charged with murder in the killing of the assailant of Justice Field,

whom it was his duty as a deputy-marshal to protect, was discharged from custody.

The questions, therefore, arising in this case are whether the relator, McSweeney, is held in the state court to answer for an act which he was authorized to do by the laws of the United States,—which it was his duty to do as a deputy-marshal,—and whether he did more than was necessary and proper for him to do. Rev. St. § 787, provides that "it shall be the duty of the marshal of each district to attend the district and circuit courts, when sitting therein, and to execute, throughout the district, all lawful precepts directed to him, and issued under the authority of the United States; and he shall have power to command all necessary assistance in the execution of his duty." Section 788 provides that "the marshals and their deputies shall have, in each state, the same powers in executing the laws of the United States as the sheriffs and their deputies in such state may have by law, in executing the laws thereof." It was the duty of the deputy-marshals to execute the process placed in their hands, and to arrest the defendant, Marble, and bring him under arrest to Erie, where the court was sitting. They had the right, in the performance of that duty, to use all necessary force to make the arrest, and to summon to their assistance such aid as might be required. Having arrested the prisoner, it was their duty to keep him in custody until further order of the district court, and in the performance of that duty they had the right to use all necessary force to prevent his escape or rescue. The arrest was authorized by the laws of the United States, the deputies were authorized to make the arrest by those laws, and it was their duty so to do, and the act for which it is sought to hold the relator in the state courts was one committed while in the performance of his duty. In the *Case of Sifford*, 5 Amer. Law Reg. 659, Judge LEAVITT said:

"In the first place it may be remarked that these deputies were in the possession of lawful process for the arrest of parties charged with a violation of the laws of the United States; and it may be also noticed that it was not optional with them whether they would serve the process. They were under the obligation of an oath, not only to support the constitution of the United States, but faithfully and promptly to serve all legal process which should come into their hands for service, and were subject to punishment for not doing so. There is no question that the warrants referred to were legally served, and the prisoners were lawfully in the custody of the deputy-marshals. Having the prisoners thus in lawful custody, they had an undoubted right to use all the force necessary to retain them in such custody; and, in case of an open, undisguised attempt to rescue them by force, they would be justified in killing the assailants, if that were necessary to retain the possession of their prisoner, and such killing would not be a crime against the state of Ohio."

The same rule as to the powers of officers of the law is laid down in 1 Whart. Crim. Law, §§ 406 and 407. In Murfree on Sheriffs, it is said of the powers of a sheriff:

"He is authorized to use a certain degree of force to overcome opposition. * * * Having made an arrest, he is liable for the escape of a prisoner, and it is his duty to carry the person arrested before the appropriate magistrate so that he may be dealt with according to law. [Page 628.] The

force which the sheriff is authorized to use in the execution of criminal process is limited only by the number of able-bodied men in the county. In proper cases he is authorized to call out the *posse comitatus*, and that includes all such persons. Of course it is proper to limit the force employed so that it shall be commensurate with the duty to be discharged, but the general rule is that inability is no excuse for the officer. He may, if resisted, repel force with force, and even take life, when it is made absolutely necessary by the resistance of the party sought to be arrested and those aiding and abetting him. In that case the homicide is justifiable, because it is in furtherance of justice. [Page 632.] Persons who encourage a prisoner to resist, or otherwise espouse his cause, may be arrested and imprisoned by the officer, and, when a prisoner is in custody of an officer, and under a charge of felony, a rescue of such a prisoner is a felony. [Page 634.]"

And the Revised Statutes make it an offense against the United States, punishable by fine and imprisonment, to obstruct, resist, or oppose any officer of the United States in serving or executing any process or warrant or order of any court of the United States, or to assault any such officer discharging such duty, or by force to set at liberty or rescue any person committed for an offense against the United States, either before or after conviction.

In the *Case of Sifford, supra,* the deputy-marshals were held in a state court, upon a charge of an assault upon the sheriff, who attempted to serve a writ of *habeas corpus* issued under state authority, which directed him to take certain persons held by the deputies under process issued by a United States commissioner. The deputies resisted, the sheriff was severely wounded, but the court held that the deputies were acting in the line of their duty, and discharged them from custody. Similar decisions will be found in *Ex parte Jenkins,* 2 Wall. Jr. 521, where the court repeatedly discharged the deputy-marshal after each of several arrests by the state authorities, and in *U. S.* v. *Jailer,* 2 Abb. (U. S.) 265. It is true that a United States officer may be arrested for a crime not connected with his duty as an arresting officer, for he is liable for his individual acts as other persons. Illustrations of this will be found in *U. S.* v. *Kirby,* 7 Wall. 482, and *U. S.* v. *Weeden,* 2 Flip. 76. The relator was authorized by the laws of the United States, and it was his duty, to prevent any attempt to escape on the part of the prisoner, or interference with, or attempt to rescue, the prisoner by others, and he had the right to use the necessary force, or make the necessary display of force, to prevent this. Did he do more than was necessary and proper for him to do under the circumstances? This must be decided under all the circumstances, and keeping in mind the situation of the deputies when compelled to decide upon a course of action. Marble was accused of one of the most serious crimes punishable in the United States courts. Whether a felony or not, it was a serious offense. The relator had spent much time in investigating the case, and believed, as he states, that Marble and his friends were desperate characters. Ingenuity had been exhausted to prevent the trial of the defendant, and he was then on his road to court, where he must stand trial. He was among his friends, and, in view of the efforts already made to prevent his trial, it was natural that the dep-

uties should expect trouble in conveying him from his home to the court-house in Erie. The deputies are suddenly confronted, in a narrow passage on the bridge, by what they were justified in believing an assembled crowd of sympathizers with the prisoner. A man steps forward and seizes the horses, and brings them to a stop beside the crowd. Under the circumstances the deputies did exactly what they should have done. If they had not done as they did, but had stopped to parley, and their prisoner had been pulled out of the wagon and hustled away by the crowd, the deputies would have been guilty of gross neglect of duty. They did nothing more than was proper and necessary. Subsequent events justify their course. An abortive effort was made to hinder and delay them at Corry. A constable named Dewey made a pitiable exhibition of himself in his efforts to detain the party, and it appears that he was in the crowd at the bridge when the horses were pulled up. The man who caught the horses was not an officer. The character of the proceeding is shown by the release of Mr. Baring, a total stranger in the locality, who was also arrested, upon his own recognizance, although charged with the serious offense of pointing a deadly weapon. The prisoner seemed to take in the situation when he told McManus, after the occurrence at the bridge, that it "was some of my fool friends who thought they were doing me a good turn." The proposed arrest or interference with the deputies had been the subject of general discussion in the town of Columbus that afternoon, and had caused much excitement. The conclusion is. justified by the testimony that, had it not been for the prompt action of the deputies, and had they shown any hesitancy or trepidation, they would have been involved in a serious difficulty, which might have resulted in the rescue or escape of the prisoner, and possibly loss of life.

It ought to be understood by this time that when United States officers undertake to execute the process or orders of United States courts they do so by authority of the laws of the United States, and not by the consent of any state officer; that all power necessary and proper to enable them to perform their duty is given by the laws of the United States, they being responsible like any other officer of the law for the proper exercise of those powers; and it would seem to be proper for those whose duty it is to enforce obedience to law and preserve order in the state to extend their sympathy, if they must do something, to the side of law, rather than in aid of persons charged with serious offenses against the laws of the United States. It is the duty of the United States to protect its officers, when performing their duty, and there is no question about the power to do so. The supreme court, in the *Case of Siebold*, 100 U. S. 371, said:

"We hold it to be an incontrovertible principle, that the government of the United States may, by means of physical force exercised through its official agents, execute on every foot of American soil the powers and functions that belong to it. This necessarily involves the power to command obedience to its laws, and hence the power to keep the peace to that extent. * * * Why do we have marshals at all, if they cannot physically lay their hands on persons and things in the performance of their proper duties? What func-

tions can they perform if they cannot use force? In executing the processes of the courts, must they call on the nearest constable for protection? Must they rely on him to use the requisite compulsion, and to keep the peace, whilst they are soliciting and entreating the parties and by-standers to allow the law to take its course? \* \* \* It [the United States] must exercise its powers, or it is no government. It must execute them on the land as well as on the sea, on things as well as persons. And to do this it must necessarily have power to command obedience, preserve order, and keep the peace; and no person or power in this land has the right to resist or question its authority so long as it keeps within the bounds of its jurisdiction."

The relator, Daniel McSweeney, must be discharged from custody.