**Petition of James P. McSHANE for a Writ of Habeas Corpus.**
**No. W-C-36-62.**

United States District Court
N. D. Mississippi, W. D.
Sept. 16, 1964.

Herbert J. Miller, Jr., Asst. Atty. Gen., Department of Justice, Washington, D. C., H. M. Ray, U. S. Atty., Oxford, Miss., for petitioner.

Joe T. Patterson, Atty. Gen., State of Mississippi, Jackson, Miss., Jess L. Yancy, Jr., Dist. Atty., Bruce, Miss., for respondent.

CLAYTON, District Judge.

James P. McShane, during the time with which we are concerned, was the Chief of the Executive Office of the United States Marshals in the Department of Justice in Washington. On September 30, 1962, at the direction of the Attorney General of the United States, McShane was in Lafayette County, Mississippi, and upon the campus of the University of Mississippi and was acting in his official capacity and as a deputy United States marshal for the Northern District of Mississippi to supervise all of the deputy United States marshals who were in that area regarding the execution and enforcement of orders entered by the United States District Court for the

Southern District of Mississippi and the United States Court of Appeals for the Fifth Circuit having to do with the admission of James H. Meredith, a Negro, as a student at the University of Mississippi. He and a number of other deputy United States marshals were also directed by the Attorney General toward the removal of all obstructions of justice to insure that the orders of these courts would be executed and enforced. McShane and the other deputy marshals were acting under the immediate direction of Nicholas de B. Katzenbach, Deputy Attorney General of the United States, who was there, and were thus engaged in the performance of their duties as officers of the United States.

Disorders and a riot occurred on the campus of the University of Mississippi and elsewhere in the immediate vicinity in connection with the said admission of Meredith. At least two people were killed, many others were injured, and much property was damaged or destroyed. Afterward at a special term of the Circuit Court of Lafayette County, Mississippi, the Grand Jury returned an indictment against James P. McShane charging that on the 30th day of September, 1962, "under circumstances such that a breach of the peace may be occasioned, did unlawfully and feloniously use physical acts, to-wit: the ordering of tear gas to be fired into a crowd assembled at University, Mississippi, and thereby causing tear gas to be fired in said crowd; and such conduct did lead to a breach of the peace and did incite a riot in the place aforesaid; and as a result of said breach of the peace and riot; another person, to-wit: Walter Ray Gunter was killed, in violation of § 2087.5 of the Mississippi Code of 1942 and amendments thereto."

A warrant (capias) was issued on this indictment and was in the hands of the Sheriff of Lafayette County, Mississippi for execution when James P. McShane was taken into custody on November 21, 1962. Immediately his petition for a writ of habeas corpus was filed in this court, the writ was issued and he was produced and released on his own recognizance.

The Sheriff filed his answer or return to the petition and writ of habeas corpus; petitioner filed a traverse to this answer or return and then petitioner filed a motion for summary judgment supported by affidavits. Respondent filed an answer to the traverse and an answer to the motion for summary judgment supported by affidavits in opposition to the affidavits of petitioner. Respondent also filed a motion to dismiss. Memorandum briefs were furnished by the parties on both of said motions.

Some unusual delay in the development of this case was occasioned by an earnest effort, before petitioner's motion for summary judgment was filed, to find a time which would be suitable for the trial of the case on its merits in which due consideration had to be given to the fact that many witnesses would be required and that a large part of these had been scattered at great distances from the place where the hearing would have been held.

Additional delay was occasioned by reason of the fact that an appeal was then pending in the Court of Appeals for the Fifth Circuit from the action of this court in sustaining as motions for summary judgment, defendants' motions to dismiss filed in damage suits which arose from the incidents pertaining to the admission of Meredith to the University of Mississippi as a student. These suits were against the aforementioned Deputy Attorney General of the United States; James P. McShane, Chief of the Executive Office of the United States Marshals (the petitioner in the instant case) and other personnel of the Department of Justice of the United States.[1] Further, a case of a similar type in which an opposite result had been reached by the District Court for the Southern District of Mississippi was also then pending on appeal in the Court of Appeals. Disposition of said appeals was considered likely

1. This court's opinion is reported at 33 F.R.D. 131, under the style of three cases which were consolidated on identical motions to dismiss.

to have an important bearing on the case at bar. Hence, this court stayed its hand awaiting the opinions of the Court of Appeals and finally, on the 24th day of March, 1964, by agreement of the parties in this cause, an order was entered remanding this case to the docket to await the action of the Court of Appeals in said cases.

These appeals were decided by the Court of Appeals on June 1, 1964. Norton v. McShane, 332 F.2d 855 (5 Cir. 1964) and United States v. Faneca, 332 F.2d 872 (5 Cir. 1964). After those opinions were released, the parties were given time to express their views in memorandum briefs as to the impact, if any, they should have on disposition of this case. The last of those briefs being in, the case is now ready for disposition on petitioner's motion for summary judgment and on respondent's motion to dismiss.

## I.

■■ The essence of the motion to dismiss is that 28 U.S.C. § 2254 precludes the granting of the relief sought in this court before exhaustion by petitioner of all state remedies which are available to him. Respondent places great reliance on the case of In the Matter of Brown v. Rayfield, 320 F.2d 96 (5 Cir. 1963) wherein relief by way of habeas corpus was denied to petitioners who were engaged as private citizens in certain civil rights activities and were being held on charges of violating an ordinance of the City of Jackson, Mississippi. Respondent says that affidavits charging misdemeanors were there construed to be judgments within the meaning of section 2254 and that thus the indictment in this case is also such a judgment. This court cannot read Brown as so holding. In fact, the language indicates that there had in fact been a trial: "Appellants concede that they have not exhausted their State remedies, either by appeal or by filing a petition for a writ of habeas corpus in the state courts . . . .." (Emphasis added.) Moreover, in quoting from foot-

note 1 of its opinion in the case of In re Wykoff, 6 Race Relations Law Reporter 793, the court said: "It not appearing from anything asserted in the petition in this case that petitioner sought to appeal her conviction . . . .." (Emphasis added.)

Also, it is clear that this statute, when it was passed in its present form, was intended by Congress to afford protection to federal officers. As originally drafted, section 2254 withdrew habeas corpus from persons held "in custody pursuant to the judgment of a state court or authority of a state officer" until they had exhausted their state remedies. (Emphasis added.) The emphasized phrase was deleted at the insistence of the Senate for fear that if "the section were applied to applications by persons detained solely under authority of a State officer, it would unduly hamper Federal courts in the protection of Federal officers prosecuted for acts committed in the course of official duty." S.Rep.No.1559, 80th Cong., 2d Sess. 9 (1948). The intention is clear also that this statute in its present form was intended to be "declaratory of existing law as affirmed by the Supreme Court." H.R.Rep.No.308, 80th Cong., 1st Sess. A180 (1948). It was well recognized before Congress took this action that, unlike other situations in which the writ might be sought, habeas corpus could be granted to a federal officer who had been ordered committed on charges of violating state law, In re Neagle, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890); In re Lewis, 83 F. 159 (D. Wash.1897), or who had been indicted, West Virginia v. Laing, 133 F. 887, 888 (4 Cir. 1904); Brown v. Cain, 56 F.Supp. 56, 57 (E.D.Pa.1944), or otherwise formally charged with a state offense, United States v. Lipsett, 156 F. 65, 67 (W.D. Mich.1907); In re Fair, 100 F. 149, 150 (D.Nebr.1900), but had not yet been tried on the state charges. No case has been cited and none has been found which stands clearly for the proposition that a federal officer charged with a violation of state law while performing his official duty must exhaust state remedies before

seeking habeas corpus relief in a federal court.

It is this court's opinion that respondent's motion to dismiss is not well taken and it will be overruled.

## II.

■ With respect to the motion for summary judgment, this court is of the opinion that this is a proper procedure to be used in a habeas corpus case. In Bowdidge v. Lehman, 252 F.2d 366, 368 (6 Cir. 1958), the Court of Appeals for the Sixth Circuit expressly held that Rule 56 of the Federal Rules of Civil Procedure, which governs summary judgment, is applicable to a habeas corpus action. Bowdidge was quoted with approval by the Court of Appeals for this circuit in United States ex rel. Seals v. Wiman, 304 F.2d 53, 64 (5 Cir. 1962), where the court held Federal Rule of Civil Procedure .36 applicable in a habeas corpus case. See also Hunter v. Thomas, 173 F.2d 810 (10 Cir. 1949), where the court concluded that since no express clause in the habeas corpus provisions govern procedures with respect to new trials, Federal Rule of Civil Procedure 59 controlled.

Moreover, the statute which prescribes procedure to be followed in habeas corpus actions, 28 U.S.C. § 2243, strongly suggests that a motion for summary judgment is available in such a case. The concluding paragraph of that statute reads:

"The court shall *summarily* hear and determine the facts, and dispose of the matter as law and justice require." (Emphasis supplied.)

The summary judgment procedure prescribed by Federal Rule of Civil Procedure 56 is in no way inconsistent with the direction of this statute, but complements it and provides a simple and convenient way to expeditiously dispose of such a case where the claim is made that there is no genuine issue as to any material fact. Also, the provisions of 28 U. S.C. § 2246 which permit, in the discretion of the judge, the taking of evidence by affidavit, in the circumstances of this case, should settle this question. It must also be borne in mind that respondent in no way questions the propriety of summary judgment proceedings in this case.

## III.

In the consideration of petitioner's motion for summary judgment, it is necessary to determine whether the evidence shows any genuine issue as to any material fact.

It must first be said that there are many issues in this record which are bitterly contested. Charges and counter-charges abound. Most of these controversies are not material to a determination of whether petitioner's motion is well taken or not; and, it is not the function or the duty of this court, in this case, to resolve those controversies which do not bear materially on the issues here.

An outline of the facts which are not in dispute will serve to place this case in proper focus.

The aforementioned order of the Court of Appeals for the Fifth Circuit directed certain named individuals "and all persons acting in concert with them, as well as any and all persons having knowledge of the decree . . . to admit . . . James H. Meredith, to the University of Mississippi, on the same basis as other students at the University" and prohibited them "from any act of discrimination relating to Meredith's admission." The order of the District Court for the Southern District of Mississippi enjoined certain named individuals "and all persons in active concert and participation with them . . . from . . . refusing to admit . . . James Howard Meredith immediately to the University of Mississipi . . . ;" from "interfering in any manner · with the right of . . . James Howard Meredith to matriculate in, or attend the University of Mississippi;" and "from taking any action or doing any act or being guilty of any conduct which will impair, frustrate or defeat his right to enter the University· of Mississippi . . . .."

There was some violent opposition to Meredith's attendance at the University and the Attorney General of the United.

States determined to assign additional United States Deputy Marshals to the Oxford, Mississippi area in order to execute these court orders.

On September 26, 1962, the petitioner McShane and other members of the Department of Justice of the United States were frustrated in their efforts to have James H. Meredith admitted to the campus and registered as a student at the University of Mississippi by the then Lieutenant Governor of the State of Mississippi. They had been so frustrated at least twice before by the Governor. On the following week-end most of the students of the University were off the campus and many of them attended a football game which was played at Jackson, Mississippi on Saturday, September 29. These students were expected to return to the campus during the afternoon and night of Sunday, September 30, in order to resume their studies on Monday, October 1.

Plans were made by the Attorney General and personnel of the Department of Justice to bring James H. Meredith onto the campus for registration as a student at the University of Mississippi on Sunday, September 30. This was done without any prior consultation or co-ordination with the officials at this school although, perhaps, the Governor had been told of these plans, since at about 1:45 P.M., the Commissioner of Public Safety of Mississippi arrived at the University to meet with some personnel of the Mississippi Highway Safety Patrol, who had been ordered there by him. His initial mission, as given to him by the Governor, was to confer with a representative of the Department of Justice and arrange to clear the campus to permit helicopters to land. As soon as the patrolmen began to arrive, he instructed them to establish roadblocks at all six entrances to the campus and to prevent crowds from assembling.

At about 3:00 P.M., a Department of Justice official telephoned an official of the University and told him that Meredith would be brought to the campus that afternoon for the purpose of immediately registering him as a student. This was the first notice that the University had from anyone about these plans. The University official recommended against this course of action, pointing out that students would be returning in high spirits from a football game and that the offices of the University were not open on Sunday and would not be open until Monday. Other telephone conferences were had between these two officials, but with inconclusive results except that the Department of Justice official agreed that Meredith need not be registered until Monday. But, he stated that Meredith would be brought to the campus on Sunday.[2]

At about 2:45 P.M., the Commissioner of Public Safety met a representative of the Department of Justice and took him, at his request, to the Lyceum Building (which is the administrative center of the University) and then to the local airport. When they arrived at the airport about 3:45 P.M., the petitioner, McShane, was there in immediate charge or command of approximately 173 Deputy United States Marshals and men of the Border Patrol.

2. Detailed plans for the admission and registration of Meredith and for the maintenance of peace and good order had been developed by the Chancellor and the staff at the University of Mississippi in co-operation with alumni committees, attorneys, businessmen and police officials, and this plan had been reported to and accepted by the Board of Trustees, Institutions of Higher Learning of the State of Mississippi, which is the state agency having control of this university. These plans had been reported to and discussed with student officers and leaders and all of the preliminary work had been accomplished so these plans could have been put into operation on short notice. However, as the matter developed on Sunday, the absence of many students and student leaders from the campus, the assumption by personnel of the Department of Justice of the responsibility for Meredith's protection, and the occupation by them of a vital part of the physical plant of the University obviously made execution of these plans impossible.

(This force was later substantially increased.) He was acting under the personal direction of the Deputy Attorney General and had named John W. Cameron (a deputy marshal) as his deputy and three other of his personnel as group commanders. Each of the group commanders had command control of about one-third of the force which had been organized into twelve man squads. The members of this force were uniformed in orange colored protective vests and white hard helmets with "U. S. Marshal" printed across the front of the helmets. Each man was armed with a night stick or billy club and a revolver. Many of them had tear gas weapons and tear gas munitions were available to all. Each man was equipped with a gas mask.

At about 4:00 P.M., at the direction of the Deputy Attorney General, this force moved in convoy in army trucks to the Lyceum Building on the campus. The convoy was led by the Commissioner of Public Safety and petitioner and was accompanied by the Deputy Attorney General. Many, if not all, of these trucks were driven by Negro soldiers.

 Upon arrival at this building, the petitioner, McShane, acting under orders of the Deputy Attorney General, deployed his force completely around it at close intervals with the men facing outward. Some of the army trucks were parked nearby. The Deputy Attorney General and other Department of Justice personnel went inside the building where they conferred from time to time with University personnel and with officials of the State of Mississippi.[3]

All of the petitioner's force had been instructed that, in the event of trouble, tear gas could not be used, except on petitioner's order and that revolvers were to be used only as a last resort.

Shortly after deployment of petitioner's force, incoming traffic to the University, which was composed largely of returning students and some parents, began to increase. Some of these people began to come near the Lyceum Building out of curiosity and gradually a crowd began to build up, especially across the street in front of this building. Initially most, if not all, of this crowd were students. They first began to sing and yell and then began to jeer and taunt petitioner's force.

As the day progressed, the crowd grew in size and its members, who were angry and in a highly emotional state, increased the intensity of their jeering, taunting and harassing of petitioner's force. Members of the Highway Patrol, who were under orders of the Governor, relayed by the Commissioner of Public Safety to assist federal personnel in controlling the crowd and in keeping peace, moved this crowd back to the far side of the street several times. Some of them, from time to time, were at the forward edge of the crowd facing it, with their backs toward petitioner's force. By about 5:30 P.M. there were approximately 400 in the crowd.[4]

Objects hurled by the crowd at petitioner's force progressed from coins and small pieces of gravel to soda bottles,[5] stones and pieces of metal pipe.[6] Efforts

3. Respondent contends that the Deputy Attorney General and his force commandeered this building and in effect ousted the University officials therefrom and that the posting of petitioner's force around this building was designed to affront and insult the students of the University and the people of the State of Mississippi and, he says, this is further demonstrated by the fact that the truck drivers were sent into this building, but these matters are immaterial to the issues in this case. Petitioner, McShane, was acting under orders of his superiors in the Department of Justice

which he had no right to question and which he was obliged to obey.

4. By about 8:00 P.M., the size of the crowd exceeded 1,000.

5. Apparently at least one bottle was filled with gasoline or lighter fluid.

6. At least one piece of pipe struck one deputy marshal. Respondent's affiants do not deny this, but say it was not "reported" or known to them. They say also that one piece of pipe was shown to them by a deputy marshal as having been thrown but reported as doing no damage.

were made to set fire to a tarpaulin on one of the army trucks and to let the air out of truck tires.[7]

As early as about 6:30 P.M., an effort was made by some of petitioner's force to employ tear gas to disperse the crowd, but petitioner would not then permit this to be done. From then until about 8:00 P.M. recommendations continued to be made to petitioner to use tear gas, and at about that time, he issued orders for his force to don gas masks and shortly issued orders to use tear gas.[8] When the gas was used the riot erupted. The crowd became a violent mob and got entirely out of control.[9]

Except for such differences as are not here material, some of which have been mentioned, the facts are without substantial dispute. There is, however, a sharp difference of *opinion* with respect to the temper of the crowd and as to the use of tear gas. Affiants for respondent, experienced police officers with professional knowledge of accepted riot control procedures and familiar with the various types of tear gas, express as their *opinions*:

a) The crowd was not out of control when petitioner ordered tear gas used, but was under control and could have been kept under control with proper equipment and by the use of proper riot control tactics,[10]

b) The firing of tear gas into a group of students (male and female) was wholly unnecessary and in fact provoked the riot, and

c) That a wrong and dangerous type of gas was used indiscriminately and recklessly, thus further inflaming the crowd.

On the other hand, equally experienced and knowledgeable affiants for petitioner express as their opinions:

a) The crowd was fast getting out of hand and dangerous,

b) The use of tear gas was proper and petitioner exercised sound judgment in ordering it to be used, and

c) The gas used was a safe and proper kind for use against crowds.

---

7. At about 6:00 P.M., Meredith arrived at the local airport, but the record here does not disclose whether his presence was known to the crowd or whether he was brought to the vicinity of the Lyceum Building.

8. His affiants say and respondent argues a) that members of the Highway Patrol had informed petitioner that the masks with which the patrol was equipped would not withstand tear gas but that, nevertheless, b) petitioner ordered gas used without any warning to them, c) that a wrong and dangerous kind of gas was used (suitable for use against barricaded people but not for use against crowds), and, d) that two members of the patrol were hit by gas projectiles (one in the back) and injured, and that the patrol had to withdraw from the gassed area because their masks would not protect them. However, even assuming arguendo all of this to be true, it is not material in this case.

9. It needs saying in fairness to the Highway Patrol that when the tear gas was first used they had to and did withdraw from the area because their masks would not protect them against this gas. It needs to be said also that they re-formed out of the gassed area and were then ordered by the Commissioner of Public Safety to establish roadblocks on all highway approaches to Oxford and the University; that they continued to perform this duty all night and up into the morning of the next day, halting many automobiles and confiscating many firearms and much ammunition. They turned back hundreds of people ostensibly bound for the University campus with the purpose of participating in the riot and disorders then under way. These facts are indicative of the temper and emotions then abroad in this area and elsewhere. (Some of these automobiles were from as far away as Florida.)

10. Respondent complains, for example, that petitioner did not have available for use such valuable riot control equipment as police barricades, "bull horns" and public address systems, carbide police lights, floodlights and the like. But, it must be said that neither did the Highway Patrol and they came to the campus to prevent crowds and disorder. Obviously, planning and preparation by *no one* was adequate to deal with the problems which arose that day.

It is also in evidence that after the gas was first used, the Deputy Attorney General expressed his disapproval thereof, saying, in effect, that "somebody jumped the gun." It is also argued (but is not in evidence) that the President said afterward that the marshals were inexperienced.

But, estimating the temper of a crowd, which can change into a mob in the twinkling of an eye, is a matter of judgment. The difference between a mob and a crowd is gossamer thin. Not contradicted in any way are the following statements from the affidavit of petitioner:

"At approximately 8:00 P.M., I ordered the deputy marshals to don gas masks, which was, in effect, an instruction that they be prepared to fire tear gas into the crowd. This order was given in the exercise of a considered judgment and with the conviction that the use of tear gas would be the safest way of quelling the riotous conduct of the mob, if it continued, so that the court orders might be executed.

"In the few minutes following this order, I observed the riotous conduct of the crowd continue. The hurling of bottles and rocks did not diminish, and the volume of shouting and jeering increased. It was my impression that the crowd was becoming more violent and that if it was not checked, it would break through the line of deputy marshals and disrupt the efforts that were being made to implement the court orders.

"At or about 8:00 P.M., I gave the order that tear gas be fired into the crowd. *I honestly felt that this was necessary if the court orders pertaining to the admission of James H. Meredith into the University of Mississippi were to be executed.*

"From the tenor of the remarks made by persons in the crowd, *it appeared clear that it was their pur-pose to obstruct and hinder the execution of these court orders. In directing that tear gas be fired into the crowd, it was my purpose to disperse it so as to prevent a riot which was on the verge of erupting and which I honestly believe would have prevented the implementation of the court orders.*" (Emphasis added.)

Little has thus far been said about the law which must control in this case. The petition for relief by way of habeas corpus was filed under the provisions of 28 U.S.C. § 2241(c) which in its relevant part reads as follows:

"The writ of habeas corpus shall not extend to a prisoner unless—

\* \* \* \* \* \*

"(2) He is in custody for an act done or omitted in pursuance of an Act of Congress, or an order, process, judgment or decree of a court or judge of the United States \* \*."

■ The provisions of 28 U.S.C. § 547 (b) commit to the United States marshal of each district the authority to "execute all lawful writs, process and orders issued under authority of the United States," and section 547(c) subjects marshals to the supervision of the Attorney General of the United States. Thus there can be no controversy about McShane's status at the time he ordered tear gas to be used. He was there on specific instructions of the Attorney General of the United States to execute the two court orders aforementioned, which, as a deputy marshal (if not as Chief of the Executive Office for United States Marshals) he had the statutory authority and duty to do. Thus his sole purpose there was to facilitate the execution of the orders of the federal courts and his order that tear gas be used (though it may have been based on poor judgment) was given "in the performance of the duty imposed by the Federal law." United States ex rel. Drury v. Lewis, 200 U.S. 1, 8, 26 S.Ct. 229, 231, 50 L.Ed. 343 (1906).[11]

11. Respondent urges that petitioner should be remitted to such rights as he might have to remove this criminal prosecution to the federal courts under 28 U.S.C. § 1442(a) (1) and § 1442(a) (3). But that law does not bar relief by habeas

The basic statute aforementioned (28 U.S.C. § 2241(c)) is one of the oldest of the statutes of the United States, having first been adopted as the Act of March 2, 1833, c. 57, § 7 (4 Stat. 634). The principle underlying its enactment and the cases in which it has been applied "is that the state has no jurisdiction over a person when he is acting under the authority of the United States." In re Waite, 81 F. 359, 365 (N.D.Iowa 1897). As was said in In re Neagle, supra, where a United States Deputy Marshal was discharged by habeas corpus from the custody of the State of California, which was holding him for trial on a charge of murder as the result of his having killed an individual who was threatening a Circuit Justice whom he had been assigned to protect:

> "To the objection, made in argument, that the prisoner is discharged by this writ from the power of the state court to try him for the whole offense, the reply is that if the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if, in doing that act, he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under the law of the state of California. When these things are shown, it is established that he is innocent of any crime against the laws of the state, or of any other authority whatever. There is no occasion for any further trial in the state court, or in any court." (Emphasis in the report.) [12]

See also Ohio v. Thomas, 173 U.S. 276, 283–284, 19 S.Ct. 453, 43 L.Ed. 699 (1899).

In Neagle the Supreme Court divided over whether a United States Deputy Marshal was acting in pursuance of any

---

corpus. Contemporaneously with the enactment of the habeas corpus statutes involved in this case, Congress passed a removal statute whereunder state criminal cases against certain federal officials for acts arising out of their official duties could be removed for trial to the federal courts. 4 Stat. 633–34 (1833). The scope of the removal provisions have been gradually expanded, and in 1916 it was broadened to cover officers in petitioner's category. 39 Stat. 532. However, the original statute of 1833 established *both* remedies simultaneously, and there has been no indication on the various occasions of the expansion of the removal remedy that habeas corpus was to be affected in any way. Hence, authorization in 1916 for the removal of state criminal prosecutions concerning United States marshals should no more be considered an implied pro tanto repeal of the habeas corpus remedy in such cases than was the initial decision of Congress in 1833 to afford removal to federal officials engaged in enforcing the revenue laws *in addition to habeas corpus*.

Moreover, the Supreme Court has both expressly and impliedly recognized that either remedy is available to federal officials who come within the language of both statutes. In Com. of Virginia v. Paul, 148 U.S. 107, 114, 13 S.Ct. 536, 538, 37 L.Ed. 386 (1893), the court said:

> "The prosecution and punishment of crimes and offenses committed against one of the states of the Union . . . can be interfered with by the circuit court of the United States so far only as congress, in order to maintain the supremacy of the constitution and laws of the United States, has expressly authorized *either* a removal of the prosecution into the circuit court of the United States for trial, *or* a discharge of the prisoner by writ of habeas corpus issued by that court, or by a judge thereof." (Emphasis added.)

And, in Boske v. Comingore, 177 U.S. 459, 20 S.Ct. 701, 44 L.Ed. 846 (1900), the court affirmed the release of an Internal Revenue Collector on habeas corpus notwithstanding the fact that the petitioner had, by reason of an 1864 statute, the right to remove the state prosecution to a federal court, e. g., Tennessee v. Davis, 100 U.S. 257, 25 L.Ed. 648 (1880). If the court had considered habeas corpus to be available only to a federal official who was not within the class entitled to removal, it would have denied petitioner's requested release on habeas corpus because of his failure to have the case removed prior to trial in the state courts.

12. The decision in Neagle relied heavily on an earlier set of decisions applying the same provision of the habeas corpus

*law* while he was accompanying a Circuit Justice and defending his person against physical attack. Two dissenters were of the opinion "that there was nothing, whatever, in fact, of an official character in the transaction, whatever may have been the appellee's view of his alleged official duties and powers." 135 U.S. at 80, 10 S.Ct. at 674. The majority of the court held that "any duty of the marshal to be derived from the general scope of his duties under the laws of the United States, is 'a law' within the meaning of this phrase." 135 U.S. at 59, 10 S.Ct. at 666. Here, however, as has been said, petitioner was acting under express statutory authority and under express, specific orders of his superiors.

Keeping in mind the quoted portions of petitioner's own affidavit (which are not contradicted), the language quoted in Neagle from Ex parte Siebold, 100 U.S. 371, 395, 25 L.Ed. 717 (1880), is relevant:

> "Why do we have marshals at all, if they cannot physically lay their hands on persons and things in the performance of their proper duties? What functions can they perform, if they cannot use force? In executing the process of the courts must they call on the nearest constable for protection? Must they rely on him to use the requisite compulsion, and to keep the peace, whilst they are soliciting and intriguing the parties and by-standers to allow the law to take its course?" (Quoted in 135 U.S. at 61, 10 S.Ct. at 667.)

statute, all reported together as Ex parte Jenkins, 13 Fed.Cas. 445 (No. 7,259) (E.D.Pa.1853), 135 U.S. at 73–74, 10 S.Ct. 658. In that case certain deputy marshals performing their duties under the Fugitive Slave Act, sought to arrest a runaway slave and injured him seriously while doing so. The deputy marshals were released by federal courts on the occasion of each of three arrests by Pennsylvania authorities. The court's remarks concerning the purpose of the statute, delivered on the occasion of the second release, are particularly appropriate here:

■ It seems clear to this court from the cases that one in petitioner's position should be denied relief by way of habeas corpus only if the physical force used "exceeded the exigency of the process under which (he) acted." Ex parte Jenkins, supra. If petitioner "did no more than was necessary and proper for him to do" in the exercise of his federal authority, he is entitled to release on habeas corpus. In re Neagle, supra.

Many cases have followed Neagle. Some of the illustrative decisions are Ohio v. Thomas, supra, (release of governor of federal soldiers' home who was convicted of violating state oleomargarine statute); Boske v. Comingore, supra, (release of United States Collector of Internal Revenue convicted of contempt for refusing to disclose confidential records); Hunter v. Wood, 209 U.S. 205, 28 S.Ct. 472, 52 L.Ed. 747 (1908) (release of ticket agent convicted for ticket sale made pursuant to federal injunction); West Virginia v. Laing, supra (release of members of posse who killed federal fugitive resisting arrest); Campbell v. Waite, 88 F. 102 (8 Cir. 1898), affirming 81 F. 359 (N.D.Iowa 1897) (release of federal pension examiner convicted of threatening prospective witness with perjury prosecution); Lima v. Lawler, 63 F.Supp. 446 (E.D.Va.1945) (release of naval shore patrolman convicted of assaulting civilian who interfered with patrolman's custody of sailor); In re Wulzen, 235 F. 362 (S.D.Ohio 1916) (release of army officers charged with breaching the peace by pushing back crowd block-

> "He who has read the act of Congress of March 2nd, 1833, or who remembers the times to meet which it was passed, knows perfectly well that it looked to the contingency of a collision between the general and the state authorities. There were statesmen then, who imagined it possible that a statute of the United States might be so obnoxious in a particular region, or to a particular state, as that the local functionaries would refuse to obey it, and would interfere with the officers who were charged to give it force, even by arresting and imprisoning them." 13 Fed.Cas at 449.

ing road along which military company was marching); Ex parte Gillette, 156 F. 64 (W.D.Mich.1907) (release of soldier charged with manslaughter for shooting bystander while attempting to apprehend deserter); United States ex rel. McSweeney v. Fullhart, 47 F. 802 (W.D.Pa.1891) (release of deputy marshal charged with assault for pointing a gun at individuals who interfered with custody of a fugitive). In each of these cases a federal court ordered the permanent release of a person or persons who had been taken into custody by a state under its criminal law for having committed an act pursuant to federal law or federal court orders. In each case reliance was placed on the habeas corpus provision now appearing as 28 U.S.C. § 2241(c) (2) and upon the Supreme Court's decision in In re Neagle, supra.

 The mere fact that petitioner was present at the University of Mississippi in an official capacity, and that he was then acting to execute federal court orders does not qualify him for release on habeas corpus. Certainly it cannot be said that any federal official is absolutely immune merely because of his official standing and his official purpose. The act which he commits in this capacity, in order to meet the requirements of the statute "must be done in pursuance of his official duty." Isaac v. Googe, 284 F. 269, 270 (5 Cir. 1922). See also Puerto Rico v. Fitzpatrick, 140 F.Supp. 398 (D. Puerto Rico 1956) and Ex parte U. S. ex rel. Anderson, 67 F.Supp. 374 (S.D.Fla. 1946). The statutory habeas corpus provision for the benefit of federal officers was not intended to place beyond the reach of a state's criminal law federal officials *who employ means which they cannot honestly consider reasonable in discharging their duties or who otherwise act out of malice or with some criminal intent.* Consequently, when the evidence discloses, as it did, for example, in Castle v. Lewis, 254 F. 917 (8 Cir. 1918) that federal officials acted without reasonable cause or that their conduct was unreasonably dangerous "in the exercise of sound discretion" (254 F. at 926), re-

lease on habeas corpus should be denied. Indeed, even if there is material conflict of evidence such that if the state's version is accepted "it could not reasonably be claimed that (the act charged to be criminal was committed) in the performance of the duty imposed by the Federal law," habeas corpus should be denied. United States ex rel. Drury v. Lewis, supra. See also Birsch v. Tumbleson, 31 F. 2d 811 (4 Cir. 1929).

 The standards by which the act committed by the petitioner are to be measured must take into account the circumstances existing at the time he gave his command *as they appeared to him,* and the reasonableness and integrity of his conclusion that such action was necessary. From the reported cases, it would appear that he is entitled to release in these proceedings if the evidence revealed that, in the exercise of a sound judgment under the circumstances, he could reasonably have entertained an honest belief that it was necessary to have tear gas fired into the crowd in order to discharge his lawful duty. This standard has been applied consistently by the federal courts which have been faced with similar questions. See United States ex rel. McSweeney v. Fullhart, supra, "[d]id he do more than was necessary and proper for him to do under the circumstances? This must be decided *under all the circumstances,* and keeping in mind the situation of the deputies when compelled to decide upon a course of action"; In re Lewis, supra, "and all that they did was in an official capacity, *without any private or individual malice,* and without any felonious intent to commit a robbery or to do any criminal act"; In re Fair, supra, "[i]f, then, the petitioners acted under such order in good faith, without any criminal intent, but *with an honest purpose to perform* a supposed duty, they are not liable to prosecution under the criminal laws of the state"; West Virginia v. Laing, supra, "[f]rom the evidence we are to determine whether or not the appellees were *honestly endeavoring to lawfully execute the writ* issued by the court below, and whether or not the circum-

stances attending such endeavor on their part authorized them to act as they did"; Ex parte Gillette, supra, "[i]f a reasonable question existed, under a conflict of testimony, whether the guard was acting wantonly, rather than in the supposed performance of his duty, or otherwise stated, *whether it was believed by him at the time* to be reasonably necessary to shoot, I should perhaps exercise the discretion which rests in me in favor of submitting the question to a jury in the state court"; In re Wulzen, supra, "federal courts have authority in habeas corpus proceedings . . . to determine whether *the acts were done wantonly and with criminal intent*; if not so done, the release must follow"; Ex parte Beach, 259 F. 956, 960 (S.D.Cal.1919), "he used only such means or methods as were available to him, and to such extent only as the apparent necessities of the situation demanded, and that he was at *no time possessed of any ulterior design or motive*, or any intention of doing anything other than merely to perform his full duty toward his government"; Ex parte Warner, 21 F.2d 542 (N.D.Okl. 1927), petitioner is entitled to discharge "whether the view taken of the evidence be that the officer deliberately shot at the deceased while he was fleeing and escaping from arrest, or that in the pursuit the pistol was accidentally discharged, resulting in the death of the person arrest-

ed"; Birsch v. Tumbleson, supra, "and that what they did was necessary, *or at least believed by them* to be necessary, to properly discharge their duties, or for their own protection"; Brown v. Cain, supra, "whether he *had reasonable cause to believe and did honestly believe* that the person he shot was guilty of the offense for which he was trying to arrest him, and whether, in attempting to make the arrest he acted within the scope of his authority and used no more force than he honestly and reasonably believed was necessary." (Emphasis added.)

 The substance of the standards applied in the foregoing cases is that of honest and reasonable belief. If, as here, the petitioner *shows without dispute that he had no motive other than to discharge his duty under the circumstances as they appeared to him and that he had an honest and reasonable belief that what he did was necessary in the performance of his duty to see to the execution of the two court orders, then he is entitled to the relief he seeks.*[13] This is so even though his belief was mistaken or his judgment poor. "[F]or the mode or manner in which he performed the duty imposed upon him by the laws of the United States he cannot be called to account in a criminal case brought in a state court, based upon provisions of a state statute." In re Waite, supra, aff'd. Campbell v. Waite, supra.[14]

---

13. Respondent urges that even in the absence of a material question of fact, habeas corpus should be denied because there is no "peculiar urgency" justifying this relief. This contention is in disregard of the long standing authority that sufficient urgency is shown whenever it is made to appear that a federal officer is detained on charges of violating state law because of acts committed in the performance of his official duties. Not only would the trial itself keep petitioner from the discharge of his responsibilities in Washington, but considerations basic to our federal system precludes subjecting to state scrutiny conduct which is within the scope of petitioner's official duties as a United States marshal. See Boske v. Comingore, supra; Hunter v. Wood, supra; Anderson v. Elliott, 101 F. 609

(4 Cir. 1900); Campbell v. Waite, supra; Brown v. Cain, supra.

14. Norton and Faneca, supra, both dealt with civil suits against petitioner and others growing out of the incidents at Oxford and the University of Mississippi with which we are here concerned. The allegations in the complaint in Faneca are strikingly parallel to those made by the indictment in this case. The plaintiff there alleged that the wrongful and negligent firing of tear gas into the crowd provoked the riot; that gas projectiles were fired at him wilfully, intentionally and purposefully, under the instructions of petitioner and the other individual defendants in that case. In Norton, plaintiffs alleged that they were unlawfully and maliciously arrested with-

To summarize, petitioner was under specific orders from his superiors and was under specific statutory duty to assist in the execution of the two federal court orders when he found himself faced with a large and growing crowd of people who were demonstrating violently their disapproval of said orders and who, as it appeared to him, were bent on obstructing the carrying out of these orders, and had for some time been engaged in doing things dangerous to persons and property. Situated as he was, it must be said, from the uncontradicted portions of his own affidavit quoted hereinbefore, that he had reasonable cause to believe that drastic action was necessary to carry out his duties, and that he had reasonable

cause to believe (and did so believe) that the use of tear gas, a discretionary choice of means on his part, was a proper measure to be taken. *These facts are not in dispute.* In this situation the petitioner cannot be held answerable to the State of Mississippi on the aforementioned indictment charging him with a violation of state law.

On the record and evidence, this court now finds that there is no genuine issue as to any *material* fact and that the petitioner, James P. McShane, is entitled to judgment as a matter of law.

Judgment in accordance with this opinion to make the writ of habeas corpus absolute is being entered.

out probable cause, maliciously detained without charges and abused and mistreated during their detention. The Court of Appeals held in both cases that suit was barred under the doctrine of "official immunity." The dissent, concurring with the majority in regard to alleged wrongful and negligent acts on the part of individual defendants, urged that the doctrine should not extend to conduct which was alleged to be wilful, intentional and purposeful. These cases strengthen this court's position in the case at bar. For, although the two cases involved were private civil actions, the principle governing there, philosophically at least, applies equally to this case. In quoting from Ove Gustavsson Contracting Co. v. Floete, 299 F.2d 655 (2 Cir. 1962), certiorari denied 374 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050, the Court of Appeals approved the proposition that it is necessary "that the government official be free to make (judgments and decisions) without fear or threat of vexatious or fictitious suits and alleged personal liability." It cannot be denied that criminal action by the state is, obviously, more vexatious and more likely to inhibit free judgment and decision making by government officials than is a private civil suit. Hence, it follows that the principle reaffirmed in those two cases carries to this one as well. As the court there stated, "the protection of the public interest" requires "shielding responsible government officers against the harassment and inevitable hazards of vindictive or ill founded (actions) based on acts done in the exercise of their official responsibilites." Norton

makes plain that unless there are "specific facts showing that there was a genuine issue for trial as to whether (petitioner was) acting within the line and scope of (his) official duties" summary judgment should be granted here. In Faneca, although the court was dealing specifically with whether or not the exception in 28 U.S.C. § 2680(a) applied to a claim asserted under the Federal Tort Claims Act (28 U.S.C. § 1346(b)), it used language which is apt here:

"Just as the tasks of carrying out the orders of this Court and of handling an unruly mob are among the responsibilities of the Chief Marshal and the Deputy Attorney General, *so is the choice of means for performing these tasks peculiarly within their discretion.*" (Emphasis added.)

In short, it would appear that the Court of Appeals in those cases went a long way toward destroying any contention that, on the facts of this case, habeas corpus does not lie. Even the dissent supports the position that habeas corpus should be summarily granted in this case. In the dissenting view it is only conduct which is malicious, or wilful, intentional and purposeful which precludes the application of the doctrine of official immunity. There is no evidence in this case on the part of respondent through his affiants that petitioner acted maliciously, or that he wilfully, intentionally and purposefully sought to cause the riot. Instead, the gist of respondent's claim is that the riot was caused because petitioner and the personnel under his command "blundered."