State of NEW YORK,

v.

**Jude TANELLA, Defendant.**

**No. 02–CR–1343 (NGG).**

United States District Court, E.D. New York.

Sept. 3, 2003.

Lawrence A Berger, Mahon & Berger, Garden City, NY, Adam S. Hoffinger, Robert A. Salerno, Piper Rudnick LLP, Washington, DC, for Defendant.

Victor Barall, Kings County District Attorney, Ann Bordley, Kings County District Attorney's Of., Leonard Joblove, District Attorney, Kings County, Brooklyn, NY, for Plaintiff.

## MEMORANDUM AND ORDER

GARAUFIS, District Judge.

Before the court is defendant Jude Tanella's motion, pursuant Rule 12(b) of the Federal Rules of Criminal Procedure, to dismiss the indictment on the ground that he is immune from prosecution under the Supremacy Clause of the United States Constitution. For the reasons stated here, the motion to dismiss the indictment is granted.

## I. FACTS[1]

Jude Tanella is a special agent with the United States Drug Enforcement Administration ("DEA"). At the time of the events giving rise to this case, he was assigned to Group D–24, New York Field Division, Drug Enforcement Task Force. (A. 265, 310, 366).[2] Group D–24 consisted of approximately sixteen to eighteen law enforcement officers from both the DEA and the New York City Police Department. (A. 199–210).

In April of 2002, as a result of a DEA investigation in another state, an individual was arrested in New York. (A. 245–47, 209–10). This individual became a confidential informant ("CI"). (A. 246–47, 266–67). The CI identified Egbert Dewgard as

---

1. Unless otherwise indicated, the facts set out here are undisputed.

2. All citations to testimony presented to the grand jury, except the testimony of Agent Tanella, refer to the State's two-volume Appendix, and are cited as "A. ——". The testimony of Agent Tanella was not included in the State's Appendix.

a person who had supplied him in the past with approximately 25 to 30 kilograms of cocaine. (A. 246–47).

Special Agent Rafael Reyes of the DEA was the supervising agent in charge of Group D–24. The second in command was New York City Police Sergeant William Murray. Agent Reyes assigned Special Agent Leonard Johnson and Detective Pedro Colon to be the co-case agents of the investigation into Dewgard. (A. 244–45, 266, 210–11). The CI provided Agent Johnson and Detective Colon with Dewgard's home address, place of business, cell phone and telephone numbers, a description of Dewgard's car, and the addresses of Dewgard's relatives. (A. 247). Detective Colon confirmed the information provided by the CI. (A. 248, 271).

On April 27, 2002, the CI contacted Detective Colon and said that Dewgard had just called him and had asked if the informant was interested in purchasing "white T-shirts." (A. 248–49). "White T-shirts" referred to kilograms of cocaine. (A. 249). Dewgard also asked the informant if he had any guns for sale. (*Id.*). The informant told Dewgard that he was interested in purchasing cocaine, but that he had no weapons and that he, the informant, would call back Dewgard later in the week. (*Id.*).

On April 30, 2002, the CI was brought to the New York Field Division Office of the DEA. (A. 249, 251). The CI placed two telephone calls to Dewgard, which Detective Colon monitored. (A. 249–51). During the course of these telephone conversations, the CI agreed to purchase three T-shirts, meaning three kilograms of cocaine, from Dewgard. (A. 250–51, 267). The CI attempted to negotiate the price down, but Dewgard informed him that he could not alter the price because the cocaine was not his. (A. 250–51). The CI and Dewgard agreed that the CI would call Dewgard the following day to arrange the time and place of the transaction. (A. 251).

After the telephone conversations between the CI and Dewgard, Agent Johnson and Detective Colon prepared a "tact plan," which described how they intended to arrest Dewgard. (A. 212–13, 251–52, 267–68, 272). Agent Tanella and ten other members of Group D–24 were chosen to participate in this operation. (A. 213, 271–72). According to the plan, on the morning of May 1, 2002, the field team would establish surveillance on Dewgard's home and at Dewgard's place of business, a printing shop in Brooklyn. (A. 212–13, 252–53). The CI would call Dewgard to set up a time and place for the exchange. (A. 213–14, 253, 267). Agent Johnson and Detective Colon instructed the informant to try to set up the exchange in a borough other than Brooklyn, because they believed that it would be safer to arrest Dewgard outside his own neighborhood. (A. 214, 253). The field team planned to follow Dewgard on his way to the exchange. (A. 215). Once the field team determined that Dewgard was in possession of the cocaine, they would stop Dewgard's car and arrest him. (A. 215, 268). Agent Johnson and Detective Colon hoped to arrest Dewgard before he reached the agreed-upon location for the exchange. (A. 215, 268). On the night of April 30, 2002, the agents and detectives who were to be part of the field team were advised of their assignments for the following day. (A. 216, 252, 314–15, 347–48).

On the morning of May 1, 2002, Agent Tanella and other members of the field team began their surveillance of Dewgard's home and place of business. (A. 215–16, 253, 314–16, 398). The agents and detectives were dressed in plainclothes and they were driving unmarked government cars. (A. 201–07, 216–17, 224, 396–98). The unmarked cars were equipped with

DEA radios, so that the agents and detectives could remain in constant radio contact. (A. 207–08, 275, 321, 397–98). The agents and detectives were armed with .40 caliber semi-automatic pistols. (A. 201–02).

Agent Tanella arrived at Dewgard's residence shortly before 7:00 a.m. and began surveillance of the home. He was the first member of the team to arrive. At about 7:15 or 7:30 a.m., Agent Tanella saw Dewgard leave his home, enter a car, and drive away. (A. 219). Tanella radioed Sergeant Murray that Dewgard was driving away, and was instructed to follow Dewgard's car. Sergeant Murray also informed Tanella that he, Sgt. Murray, was right behind him and was also following the car. After reporting this activity to Detective Colon, Agent Tanella and Sgt. Murray were instructed by Detective Colon to let Dewgard go because he would be returning to his residence later to drive his children to school. Agent Tanella and Sgt. Murray then returned to the residence.

It appears that Dewgard drove to his printing shop, where other members of the field team saw him. (A. 220). Agent Tanella and the other members of the field team who were performing surveillance at Dewgard's home were ordered to join the surveillance at Dewgard's printing shop. (A. 371, 399).

While Dewgard was inside the printing shop, the CI, who was with Detective Colon and another agent in Queens, called him to arrange the time and place for the drug transaction. (A. 218, 253, 297–98). The CI made three telephone calls to Dewgard, which were monitored by the law enforcement officers who were with him. During these telephone calls, the informant attempted to persuade Dewgard to make the transaction in Queens County, but Dewgard refused. (A. 219, 254–55). The informant eventually agreed to meet Dewgard in the vicinity of his home in Brooklyn. (A. 255–56, 299). Dewgard mentioned that he would need a little time because he had to pick up the drugs before the exchange. (A. 219, 256, 299). Detective Colon notified the field team that the time of the exchange was set for 11:00 or 11:30 a.m. in the vicinity of Dewgard's home.

At around 10:30 a.m., members of the field team saw Dewgard leave his printing shop and drive away. (A. 220, 257, 321, 399–400). Agent Reyes ordered the field team to follow Dewgard's car. (A. 220, 321). Dewgard drove to an apartment building, parked in front of it and remained inside his car. (A. 257, 276, 400–401). A man carrying a black plastic bag exited the apartment building, approached Dewgard's car, and placed the black plastic bag on the passenger seat of Dewgard's car. (A. 221, 257, 402). After a brief conversation the man went back into the building and Dewgard drove away. (A. 402). Agent Reyes instructed the field team to continue to follow Dewgard. (A. 221). At this point, three vehicles were following Dewgard's vehicle: Agent Tanella was by himself in one vehicle, Detective Edward Corcoran was by himself in another vehicle, and Agents Scott Herbel and Dennis Peterson were together in the third vehicle.

Soon thereafter, while Dewgard's car was stopped at a red light, Agent Reyes gave the order to effect a car stop and arrest Dewgard. The car with Agents Herbel and Peterson was directly behind Dewgard, and they were instructed to make the arrest. Detective Corcoran tried to box in Dewgard's car by driving his car around Dewgard's and turning in front of it so that the side of his car prevented Dewgard's car from moving forward. (A. 324–25, 327, 404–05). Agent Peterson placed a flashing red light on the dashboard of his car and he and Agent Herbel

began to exit their car in order to make the arrest. (A. 207, 317–18, 324–26). Agent Tanella was directly next to the car with Agents Herbel and Peterson.

Dewgard then looked in his rear view mirror and over his right shoulder. (A. 405). At first, Dewgard's car started to roll forward slowly. (A. 324, 326, 405). Then he turned his steering wheel to the right and pressed the accelerator, ramming the right front bumper of Detective Corcoran's car. Dewgard then drove up onto the sidewalk past Detective Corcoran and continued driving along Farragut Road at an extremely high rate of speed. (A. 325, 327, 405–06).

The field team immediately began pursuing Dewgard. (*Id.*). Detective Corcoran's car was initially leading the pursuit, but because he did not have lights or sirens in his car, he pulled aside to permit the remaining cars to take the lead. (A. 328, 405–06). Agent Tanella, whose lights and sirens were on, started to lead the pursuit. (A. 327–28, 406, 408). The other members of the field team lost sight of the pursuit, but heard Agent Tanella continuously transmitting his location on the radio.

The pursuit continued on Farragut Road for approximately fifteen blocks. Farragut Road has one lane of traffic in each direction. Dewgard drove his car at a high rate of speed, often swerving into oncoming traffic and onto the sidewalk. (Tanella 94).[3] He continued to drive in this manner until he drove up on the sidewalk and wedged his car in between a telephone pole and a hydrant at the intersection of Farragut Road and New York Avenue. (A. 7). In doing so, he nearly struck a woman and her baby who were on the sidewalk. (A. 8).

Dewgard then got out of his car and started running along New York Avenue towards Foster Avenue, still carrying the black plastic bag. (A. 9). Agent Tanella stopped his car next to Dewgard's, radioed the other officers that he was in a foot pursuit, and began to chase Dewgard. (A. 9–10). While chasing Dewgard, Agent Tanella continued shout that he was the police and instructed Dewgard to stop.

At this point, the State's witnesses provide varying accounts of the events that followed. There is no dispute, however, that Agent Tanella caught up with Dewgard, and that a violent close quarter struggle ensued, during which Dewgard continued to resist Tanella's efforts to apprehend him. The two were struggling in a narrow space between two parked vehicles, just off the curb. At some point during the struggle, Agent Tanella fired one shot killing Dewgard.

Agent Tanella claims that during their struggle Dewgard reached for his gun, which Tanella perceived as an immediate threat to his life, forcing him to shoot. (Tanella 108–09). The State argues that Dewgard was getting the better of Agent Tanella throughout their struggle, and at one point managed to push Tanella away and resume his escape. According to the State's account, Tanella shot Dewgard in the back to prevent his escape. This, the State contends, was neither necessary nor proper, but was, rather, an unconstitutional use of force, which strips Tanella of immunity. Exactly what occurred during this struggle is at the heart of Agent Tanella's motion to dismiss, and forms the basis of the State's indictment. The various accounts of the State's witnesses are considered in greater detail below.

---

3. Citations to the testimony of Agent Tanella refer to Section H of the appendix filed by the defense in support of the motion to dismiss. Although the State did not include Agent Ta-

nella's testimony in its submission, it has not come forth with any evidence disputing the portions of his testimony cited here.

## II. PROCEDURAL BACKGROUND

The State of New York, through the Office of the Kings County District Attorney, presented evidence to a grand jury, which returned a one-count indictment against Agent Tanella charging him with Manslaughter in the First Degree, a violation of N.Y. Penal Law § 125.20(1).[4] Tanella was arraigned on the charge in Kings County Supreme Court on November 1, 2002, and entered a plea of not guilty.

On November 13, 2002, Tanella filed a Notice of Removal pursuant to the Federal Officers Removal Statute, 28 U.S.C. § 1442(a)(1). The State filed briefs in opposition to removal, and oral argument was heard on December 12, 2002. By Memorandum and Order dated January 13, 2003 the court removed this case from the New York Supreme Court. *See New York v. Tanella*, 239 F.Supp.2d 291 (E.D.N.Y.2003).

## III. STANDARD OF REVIEW

Agent Tanella filed the instant motion to dismiss the indictment pursuant to Fed. R.Crim.P. 12(b). The State filed a Memorandum of Law in Opposition to the Motion to Dismiss ("State Memo"), and a two-volume appendix consisting of transcripts of the grand jury proceedings.[5] After the motion was fully briefed, the court heard oral argument on May 12, 2003.[6]

Rule 12(b) of the Federal Rules of Criminal Procedure provides that "A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue." Fed.R.Crim.P. 12(b)(2). The Advisory Committee Notes indicate that the defense of immunity is among the defenses which is "capable of determination without a trial of the general issue." *See Kentucky v. Long*, 837 F.2d 727, 750 (6th Cir.1988) ("We therefore hold, as a general proposition, that a Rule 12(b) motion is a proper vehicle by which to assert the defense of immunity under the Supremacy Clause of the United States Constitution.").

Although a motion to dismiss generally presents the court with only issues of law, it is clear from Rules 12(d) and (f) that a court may make certain factual findings in deciding the motion. *See* Fed.R.Crim.P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."); Fed. R.Crim.P. 12(f) ("All proceedings at a motion hearing, including any findings of fact and conclusions of law made orally by the court, must be recorded by a court reporter or a suitable recording device."); *see also Long*, 837 F.2d at 750 (noting that courts may make preliminary factual findings "necessary to decide the questions of law presented by a pre-trial motion"). The defense of Supremacy Clause immunity may be determined "without a trial of the general issue," Fed.R.Crim.P. 12(b)(2), "if trial of the facts surrounding the commission of the alleged offense would be of no assistance in determining the validity of the defense." *United States v. Covington*, 395 U.S. 57, 60, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969). It is important to note the distinction—albeit a narrow one—between

---

4. N.Y. Penal Law § 125.20(1) states: "A person is guilty of manslaughter in the first degree when ... With intent to cause serious physical injury to another person, he causes the death of such person or of a third person."

5. The court granted the State's motion to file the transcripts under seal. However, because the State relies exclusively on the evidence presented to the grand jury, I quote relevant portions of the transcript where appropriate.

6. The court also received an Amicus Curiae Memorandum of Law in Support of the Motion to Dismiss from the Federal Law Enforcement Officers Association. The Association did not request oral argument.

facts surrounding the commission of the offense, which may be for a jury to decide, and facts concerning the validity of the defense, which are properly the province of the court. The State blurs this distinction by arguing that the immunity defense should be decided by a jury.

The State also misconceives the distinction between Supremacy Clause immunity and the defense of justification under state law, arguing that the two are inextricably linked and should be resolved at trial. *See* State Memo, at 36. Such reasoning, however, is contrary to the rationale behind federal immunity. As the Sixth Circuit explained in *Long,* federal immunity under the Supremacy Clause is analogous to the concept of qualified immunity in the civil context. In both cases, "there comes a point early in the proceedings where the federal immunity defense should be decided in order to avoid requiring a federal officer to run the gauntlet of standing trial and having to wait until later to have the [immunity] issue decided." *Long,* 837 F.2d at 752; *see Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985) (stating that qualified immunity "is an *immunity from suit* rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial") (emphasis in original).

 The burden of presenting evidence raising a *material* issue of fact concerning the validity of Supremacy Clause immunity is on the State. *See Long,* 837 F.2d at 752; *City of Jackson v. Jackson,* 235 F.Supp.2d 532, 534 (S.D.Miss.2002). The court, however, views the evidence in the light most favorable to the State, and assumes the truth of the allegations in the indictment. *See Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952) ("This case is here to review the granting of a motion to dismiss the indictment. It

should not be necessary to mention the familiar rule that, at this stage of the case, the allegations of the indictment must be taken as true."); *United States v. Yashar,* 166 F.3d 873, 880 (7th Cir.1999) ("We must view all facts in the light most favorable to the government on a motion to dismiss [the indictment]."); *Morgan v. California,* 743 F.2d 728, 733 (9th Cir.1984) (stating that in granting a writ of habeas corpus on the basis of the Supremacy Clause, the court must "view[ ] the disputed evidence in the light most favorable to the state"); *Clifton v. Cox,* 549 F.2d 722, 728 (9th Cir.1977) (assuming the truth of the state's evidence in determining whether the conduct of a federal officer was necessary and proper).

This does not mean, however, that mere allegations by the State, without evidentiary support, are sufficient to raise a material issue of fact concerning the validity of the immunity defense. *See Long,* 837 F.2d at 752 ("We merely hold that, when a threshold defense of federal immunity is raised to meet a state criminal prosecution, the state cannot overcome that defense merely by way of allegations."). In this case, for example, the indictment does not allege any facts; it merely repeats the statutory elements of manslaughter in the first degree under New York law. Thus, for purposes of this motion, I assume that Tanella intended to "cause serious physical injury to another person, [and caused] the death of such person." N.Y. Penal Law § 125.20(1). That fact, which is typically the general issue to be decided at trial, provides "no assistance in determining the validity of the [immunity] defense." *Covington,* 395 U.S. at 60, 89 S.Ct. 1559. Accordingly, because the material facts bearing on the question of immunity are undisputed, the court can decide that question "without a trial of the general issue." Fed.R.Crim.P. 12(b)(2).

## IV. DISCUSSION

The delicate and uneasy task before the court is deciding whether an agent of the United States shall be subject to the criminal law of one of its sovereign members—the State of New York. Although our nation has matured since the early days of the Republic when clashes between individual states and the federal government were almost ubiquitous, cases such as this reflect the tension inherent in our dual system of government. As Justice Kennedy reminds us,

> The Framers split the atom of sovereignty. It was the genius of their idea that our citizens would have two political capacities, one state and one federal, each protected from incursion by the other.... It is appropriate to recall these origins, which instruct us as to the nature of the two different governments created and confirmed by the Constitution.

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 838–39, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (Kennedy, J., concurring). Despite our respect for the principle of federalism, and its remarkable success in averting usurpations of power by either the federal or state government, it cannot be denied that in our modern, complex world the two sovereigns often meet, whether in cooperation or in conflict. In this case, unfortunately, we find ourselves in the latter situation.

### A. Supremacy Clause Immunity

The Supremacy Clause of the Constitution provides that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land." U.S. Const. art. VI, cl. 2. The familiar principle of federal supremacy was first announced in *M'Culloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819). In holding that the State of Maryland could not tax the Bank of the United States, Chief Justice John Marshall explained that "the constitution and the laws made in pursuance thereof are supreme ... they control the constitution and laws of the respective states, and cannot be controlled by them." *Id.*, 17 U.S. at 426.

In *Tennessee v. Davis*, 100 U.S. 257, 25 L.Ed. 648 (1879), the Supreme Court applied the principle of federal supremacy to the case of a federal revenue collector indicted for murder by the State of Tennessee. In upholding the right of a federal officer to remove the state prosecution to federal court, the Court stated:

> [The federal government] can act only through its officers and agents, and they must act within the States. If, when thus acting, and within the scope of their authority, those officers can be arrested and brought to trial in a State court, for an alleged offence against the law of the State, yet warranted by the Federal authority they possess, and if the general government is powerless to interfere at once for their protection,—if their protection must be left to the action of the State court,—the operations of the general government may at any time be arrested at the will of one of its members.

*Id.*, 100 U.S. at 263.

Following this line of cases, a federal officer's immunity from state prosecution under the Supremacy Clause was recognized in the case of *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890). In that case, David Neagle, a deputy United States Marshal was assigned to protect Supreme Court Justice Stephen Field, who had been publicly threatened by David Terry, a dissatisfied litigant. While on board a train in California, Neagle observed Terry approach the judge in a menacing manner. At that point, Neagle identified himself as an officer and ordered Terry to stop. Terry then reached into his

pocket, and Neagle, thinking that Terry was about to pull out a weapon, shot and killed him. It turned out that Terry had no weapon. Neagle was arrested and charged with murder by the State of California.

In affirming the issuance of a writ of habeas corpus discharging Neagle from the custody of the state sheriff, the Supreme Court held that

> if the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he cannot be guilty of a crime under the law of the State of California. When these things are shown, it is established that he is innocent of any crime against the laws of the State, or of any other authority whatever. There is no occasion for any further trial in the state court, or in any court. The Circuit Court of the United States was as competent to ascertain these facts as any other tribunal, and it was not at all necessary that a jury should be impaneled to render a verdict on them.

*Neagle,* 135 U.S. at 75, 10 S.Ct. 658.

■ Accordingly, the test for Supremacy Clause immunity has two components: (1) whether the federal officer was acting pursuant to the laws of the United States; and (2) in performing his duty, the officer did no more than what was necessary and proper for him to do. *See Id.; Whitehead v. Senkowski,* 943 F.2d 230, 234 (2d Cir. 1991) (stating the elements of the test); *Long,* 837 F.2d at 744 (same); *Clifton v. Cox,* 549 F.2d 722, 730 (9th Cir.1977) (same). In this case, there is no dispute that Tanella was acting pursuant to federal law. The State charges, however, that Tanella shot Dewgard in the back in order to prevent his escape. That unconstitu-

tional act, according to the State, strips Tanella of federal immunity.

In order to satisfy the "necessary and proper" component of Supremacy Clause immunity, a defendant must "reasonably believe[ ] that his actions were necessary to perform [his] job ... and [he] had no motive other than to do his job.... Thus the agent must have a subjective belief that his conduct was justified, and that belief must be objectively reasonable." *Whitehead,* 943 F.2d at 234 (citing *Clifton,* 549 F.2d at 728; *Long,* 837 F.2d at 744–45; *In re McShane,* 235 F.Supp. 262, 273 (N.D.Miss.1964)).

In *In re McShane,* 235 F.Supp. 262 (N.D.Miss.1964), the State of Mississippi indicted a United States Marshal, James McShane, for breach of the peace and inciting a riot. McShane was the marshal in charge of the operation to enforce federal court orders that permitted James Meredith to enroll at the University of Mississippi. *Id.* at 263–64. The marshals surrounded the university's administration building in order to ensure that Meredith would be permitted to enroll. A crowd began to gather, and, as the day went on, it grew larger and angrier; some in the crowd began to throw objects at the marshals. *Id.* at 268. At some point McShane ordered the marshals to fire tear gas into the crowd, and a riot erupted, during which two people were killed.

McShane filed a petition for a writ of habeas corpus, which was granted on a motion for summary judgment, even though the state presented expert testimony questioning the wisdom of using tear gas and challenging McShane's assessment of the crowd's level of anger. *Id.* at 269. The court noted that although factual disputes existed, they were not material to the resolution of McShane's petition. The court stated:

If, as here, the petitioner shows without dispute that he had no motive other than to discharge his duty under the circumstances as they appeared to him and that he had an honest and reasonable belief that what he did was necessary in the performance of his duty to see to the execution of the two court orders, then he is entitled to the relief he seeks. This is so even though his belief was mistaken or his judgment poor.

*Id.* at 274. The focus of the court's inquiry was the absence of any disputed fact concerning McShane's belief or the reasonableness of his action. That a different course of action might have been more appropriate is beyond the scope of this inquiry.

In *Clifton v. Cox,* 549 F.2d 722 (9th Cir.1977), the Ninth Circuit affirmed the granting of a writ of habeas corpus to a DEA [7] agent who shot an unarmed fleeing suspect in the back, because of a mistaken belief that the suspect shot his partner. Agent Clifton and his partner were part of a task force that was executing an arrest warrant for a drug suspect who was thought to be armed. *Id.* at 724. The task force was transported to the site of the raid via an army helicopter. As the agents were disembarking from the helicopter, Agent Clifton's partner tripped and fell just as Agent Clifton heard a noise that sounded like gun fire. *Id.* Thinking that his partner had been shot, Agent Clifton rushed the cabin and kicked in the door, but did not identify himself as a law enforcement officer. As Clifton entered the cabin, the suspect ran out. Clifton shouted "halt" twice, and shot the suspect in the back killing him. *Id.* Clifton was indicted for second degree murder and involuntary manslaughter by the State of California. His petition for a writ of habeas corpus was granted by the district court, and the Ninth Circuit affirmed.

■ The court acknowledged that there was conflicting evidence concerning the existence of exigent circumstances justifying the entry into the cabin, and whether the suspect fled prior to Clifton's entry. The court held, however, that "resolution of these factual conflicts ... is immaterial to the resolution of the ultimate issue of whether [Clifton] employed means which he could consider reasonable in the discharge of his duty." *Id.* at 728. The Ninth Circuit stated that in determining whether an officer's act was necessary and proper under the Supremacy Clause, the officer need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Id.* Thus, even a mistaken belief as to the necessity of using deadly force may be protected by the Supremacy Clause, if the officer's belief was honest and reasonable.

In this case, the State urges the court to deny immunity because the issue of whether Dewgard was turning to run is a disputed issue of fact. It cites *United States ex rel. Drury v. Lewis,* 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906), and *Morgan v. California,* 743 F.2d 728 (9th Cir.1984) in support of its position. Each of those cases, however, is distinguishable.

In *Drury,* two United States soldiers were indicted by the State of Pennsylvania on charges of murder and manslaughter for shooting a man who was suspected of stealing from a federal arsenal. Under the law as it existed at the time it was permissible to shoot a suspect who was escaping arrest. The soldiers claimed that the suspect was fleeing, while other witnesses testified that he had surrendered. *Id.* at 8, 26 S.Ct. 229. The Supreme Court

---

**7.** Agent Clifton was an agent for the Bureau of Narcotics and Dangerous Drugs, the predecessor agency of the DEA. *See Clifton,* 549 F.2d at 723 n. 1.

affirmed the denial of a writ of habeas corpus on the basis of the conflicting testimony.

In that case, however, it was conceded by the soldiers that if the suspect had in fact surrendered, as stated by some witnesses, their shooting would have been unlawful and therefore unreasonable. By contrast, in this case, resolution of the conflicting testimony offers no assistance in determining whether Tanella acted reasonably under the circumstances. As discussed below, it does not matter whether the State's witnesses are correct that Dewgard was turning to run away, or whether Tanella's perception was correct that Dewgard was reaching for his weapon. In either case, Tanella's action was reasonable under the circumstances.

Finally, in *Morgan*, the Ninth Circuit reversed the district court's order granting a writ of habeas corpus releasing two DEA agents from state custody for several misdemeanors arising from a minor traffic accident. There, too, factual disputes precluded application of Supremacy Clause immunity. In that case, the agents claimed that they were on their way to meet an informant when they were involved in a traffic accident. *See Morgan*, 743 F.2d at 729. According to the agents, during their argument with the driver of the car he threatened them with a gun, but no gun was found. *Id.* at 730. The driver, on the other hand, claimed that the agents were drunk and had assaulted him. *Id.* After local police officers arrived on the scene, they determined that the agents were under the influence of alcohol and arrested them. The officers also testified that the agents told them that they were on their way to the police academy for drinks, not to meet an informant. *Id.*

Reversing the district court's order, the Ninth Circuit held that if the factual disputes in that case were resolved in the state's favor, the agents would not be entitled to immunity. First, if the agents were in fact on their way to the police academy for drinks, their encounter with the driver was not pursuant to the laws of the United States. Second, if the driver did not in fact have a weapon, their search of him was likewise unauthorized. In that case, therefore, the issue was not the reasonableness of the agents' actions, but whether they were even acting within the scope of their federal authority. That is not the issue before me in this case.

Although factual disputes exist between Tanella's version of events and the version offered by the State's witnesses, and although there are differences among the witnesses themselves, the differences between the various accounts are immaterial. Assuming, as I must, that Dewgard was attempting to escape, I nevertheless find that under all the circumstances Agent Tanella was reasonable in believing that Dewgard reached for his weapon. Moreover, considering the information Tanella had about Dewgard's criminal activities, the reckless and dangerous manner with which he evaded law enforcement personnel and placed the public at risk of injury, and the violent struggle in which he engaged amply support a finding that Tanella was justified in shooting him.

### B. The Testimony in This Case

#### 1. Agent Tanella

Agent Tanella testified that after Dewgard's vehicle came to a stop, he observed Dewgard exit the vehicle and begin running away. Tanella saw that Dewgard held the black plastic bag in his right hand, but could not see whether anything was in his left hand, nor could he see whether Dewgard had anything in the front of his waistband, the so called "high risk area" where a weapon may be concealed. (Tanella 121). Tanella then radioed his team that he was in a foot pursuit,

took his badge, which was hanging on a chain around his neck, out from underneath his shirt, drew his weapon, and began to chase Dewgard. (Tanella 97–98). Tanella did not have his portable radio, and, aside from his badge, he had nothing identifying him as a law enforcement officer. (Tanella 99).

During the chase Tanella continued to shout that he was the police, and ordered Dewgard to freeze. Tanella's weapon was in his left hand against his body, but his finger was not on the trigger. (Tanella 100). Tanella testified that the two were first running in the middle of the street and then on the sidewalk. At some point, when Tanella was catching up to him, Dewgard ran in between two parked vehicles, heading back towards the street. According to Tanella, as Dewgard stepped off the curb, he slipped and fell between a car and a van that were parked there. (Tanella 102). When Dewgard fell to the ground, the black bag he was carrying slid under the rear bumper of the van, from where it was later recovered.

Tanella further testified that when Dewgard fell, Tanella got down next to him, "kneeling next to him, almost in a straddling position," and attempted to subdue Dewgard in order to arrest him. (Tanella 103). He claims that while they were in this position, Dewgard resisted all attempts to arrest him, and repeatedly struck Tanella with his hands and fists. Dewgard was approximately six foot two, and weighed about two hundred pounds. (A. 183). Tanella is approximately five foot ten, and approximately one hundred eighty pounds. (Tanella 111–12). He testified that his left hand remained on his gun, and that during the struggle he positioned himself so that the left side of his body and the gun were out of Dewgard's reach. With his right hand, Tanella tried both to defend himself against Dewgard's punches and subdue him while waiting for other members of his team to arrive. He also testified that he kept ordering Dewgard to stop resisting arrest, and asked the crowd that was gathering to call the police. (Tanella 103–05). Tanella perceived that the struggle was increasing in intensity. (Tanella 112). Indeed, after shooting Dewgard, Tanella was physically exhausted and required assistance from other officers just to stand up. (Tanella 115).

At some point during this struggle, Dewgard managed to push Tanella off him, leaving Tanella on his hands and knees next to Dewgard, who was sitting upright on the ground facing Tanella. (Tanella 109, 155). Agent Tanella testified that at this point Dewgard looked at the gun and began to reach for it with his right hand, twisting his body towards Tanella. (Tanella 109, 113). Tanella perceived that movement as an immediate threat to his life and fired a single shot killing Dewgard. (Tanella 108–09). At that moment, the two men were within arms reach of each other, just off the curb between two parked vehicles. (Tanella 116).

### 2. Benjamin Shurin

On May 1, 2002, Benjamin Shurin arrived on New York Avenue and had just parked his van when he observed Dewgard running past him, carrying a black plastic bag. Mr. Shurin testified that he observed Tanella running after Dewgard with his badge hanging around his neck, his gun drawn, and ordering Dewgard to get down. He also testified that Tanella was running in the middle of the street, while Dewgard was on the sidewalk. He observed Dewgard run across the street, and Tanella used that time to catch up to him and tackle him to the ground. (A. 17–18). Mr. Shurin then crossed the street and stood on the opposite sidewalk from where he parked to watch the struggle. He was

approximately one or two feet away. (A. 25).

Mr. Shurin confirms that Dewgard was face down on the ground, off the curb, between two parked vehicles. (A. 19). He also testified that Tanella was trying to hold Dewgard down, but that Dewgard managed to get up and "tried to run." (A. 19–20). Mr. Shurin could not tell how Dewgard managed to get up because Tanella's back was blocking his view. (A. 20). It appeared to him that Tanella was attempting to hold Dewgard by pulling at him. Almost immediately after seeing Dewgard get up, Mr. Shurin heard a pop and saw both men fall to the ground. (A. 21). Mr. Shurin testified that Dewgard fell on his back.

### 3. Edward John

Edward John is a resident of the housing complex located on New York Avenue, between Farragut Road and Foster Avenue. On May 1, 2002, Mr. John was standing at the gate of the housing complex facing New York Avenue. While standing there, he heard a loud voice behind him saying, "Don't move. Stay down," and threatening to shoot. (A. 34). Mr. John then turned in the direction of the voice and observed Tanella with a gun in his left hand, sitting on top of Dewgard, holding him down and ordering him not to move. (A. 35–36). Mr. John could only see Tanella's back and side, but had a full frontal view of Dewgard. (A. 40). He was standing "very close" to where the two were struggling.[8] Mr. John testified that Dewgard was moving around, "trying to get up," and not listening to Tanella's orders. (A. 37). He also testified that Ta-

nella was calling for backup using a walkie-talkie.[9]

Mr. John testified that when Dewgard pushed Tanella off him, Tanella pushed him against the car and held him there, still ordering him to freeze and threatening to shoot. (A. 39). Tanella's gun was pointed in the air. Mr. John then observed Dewgard push away and "turn[ ] to run across the street." (A. 40). He stated that Dewgard "want [sic] to make two or three steps away from the cop when the cop shoot him in his back." (Id.).

### 4. Synthia Bobbit

Synthia Bobbit was crossing New York Avenue when she observed Dewgard running on the sidewalk with Tanella chasing him. She then returned to the sidewalk from which she had crossed, and observed Dewgard crossing the street towards her. (A. 56–58). She testified that Tanella was getting closer to Dewgard, and that Dewgard tried to "duck in between two cars," when he slipped and fell. (A. 58). According to Ms. Bobbit, Tanella grabbed Dewgard when he fell and tried to handcuff him. They continued to struggle on the ground, with Dewgard resisting Tanella's attempt to handcuff him. At some point during the struggle, Dewgard crawled to one of the cars and pulled himself up, with Tanella still trying to handcuff him. (A. 62). Ms. Bobbit stated that Dewgard "was getting the best of [Tanella] ... [and Tanella] couldn't do nothing with [Dewgard]." During the final moments of the struggle, she observed Tanella move away from Dewgard and Dewgard lean towards Tanella, after which

---

**8.** Throughout the transcript of the grand jury proceedings, the prosecutor often attempts to specify a witness' testimony concerning distance by referring to the number of floor tiles between himself and the witness. Although creating a clear record is a laudatory goal, referring to floor tiles, without at least stating

the dimensions of one tile, leaves too much to guesswork.

**9.** No one else testified that Tanella had a radio of any kind. In fact, Tanella testified that he had no portable radio with him on that day. (Tanella 72).

Tanella shot him. (A. 63). According to Ms. Bobbit, Dewgard fell on his back after being shot.[10] She was approximately two car lengths away from the men during their struggle.

### 5. Benjamin Murray

Benjamin Murray saw Tanella and Dewgard fighting approximately two or three feet from the curb. (A. 76). He stated that Tanella was on top of Dewgard, telling him not to move, and that Dewgard was attempting to push Tanella off him. (A. 77–78). Mr. Murray testified that during the struggle Tanella managed to handcuff Dewgard. (A. 80). Dewgard then made a slight move from side to side as though he were about to run, and Tanella shot him. (A. 80–82).[11] Mr. Murray was three or four feet away from the fight. (A. 78).

### 6. Barbara Gurly

Barbara Gurly testified that she first saw Tanella chasing Dewgard along the sidewalk. Then they both stopped running and were standing upright together,[12] still on the sidewalk, while Tanella attempted to handcuff Dewgard, who was resisting. (A. 100–03). Ms. Gurly testified that Dewgard was moving his hands, trying to prevent Tanella from placing him in handcuffs, and that Tanella told him to stand still or he would shoot. (A. 106). She stated that Tanella was standing behind Dewgard holding his arm, then took out his gun and shot him. (A. 109–12).

### 7. Jewel Wallace

Jewel Wallace observed the altercation from the window of her fifth floor apartment. She testified that she heard Tanella identify himself as the police and order Dewgard to stop. According to Ms. Wallace, Tanella and Dewgard were struggling over the hood of a car,[13] with Dewgard trying to push Tanella away and run. (A. 120). She stated that Dewgard tried to run before Tanella shot him, and that the two were at arms length distance from one another. (A. 126, 128).

### 8. David Taylor

David Taylor, a resident of a housing complex on New York Avenue, was leaving his building when he observed Tanella and Dewgard fighting. (A. 145–46). Mr. Taylor testified that Dewgard was on the hood of a car and Tanella was on top of him. (A. 149). He observed Dewgard trying to push Tanella off and attempt to run away. (A. 148). After Dewgard pushed Tanella away and turned to run, Tanella shot him. (A. 151–52). At that point, Tanella and Dewgard were facing away from Mr. Taylor, and both were standing upright.[14] (A. 152). According to Mr. Taylor, Tanella took out his gun and shot Dewgard after Dewgard pushed Tanella away. (A. 153). Mr. Taylor was approximately fifty to seventy feet away from the two men during the course of the struggle. (A. 147, 169).

---

**10.** Ms. Bobbit also testified that she saw Tanella place the handcuffs on Dewgard. Agent Herbel testified that he and Agent Peterson handcuffed Dewgard. (A. 335–36). The State seems to credit his testimony on this point. *See* State Memo, at 17 n. 12.

**11.** Mr. Murray also indicated that the gun Tanella used was a revolver, not the semi-automatic that Tanella was issued by the DEA. (A. 83, 201–02).

**12.** Ms. Gurly stated that she never observed the two men on the ground. (A. 103).

**13.** Ms. Wallace stated that Tanella and Dewgard were facing each other during the struggle. (A. 129).

**14.** Mr. Taylor testified that he never saw the men on the ground. (A. 153).

### 9. The Forensic Evidence

Dr. Marie Macajoux, the acting Deputy Chief Medical Examiner of Kings County performed an autopsy on Dewgard's body. The cause of death was a gunshot wound to the back. Dr. Macajoux testified that the bullet entered the right side of Dewgard's back, and traveled upwards from right to left. The bullet was recovered from the front left side of Dewgard's chest. (A. 184–85). According to Dr. Macajoux, the gun was pointed upward at the time of the shooting. She concluded that Tanella and Dewgard could not have been facing each other when the shot was fired. (A. 185–86).

Assuming Tanella was holding the gun in his left hand, Dr. Macajoux offered two possible scenarios to explain the path of the bullet. First, Dewgard may have been turning away from Tanella at the moment the shot was fired. (A. 193). Alternatively, Dewgard may have been reaching towards Tanella, moving the right side of his body towards Tanella, and turned his body just before the shot was fired. (A. 186–88, 193–94). Because she found no soot or stippling on Dewgard's skin or clothes, Dr. Macajoux concluded that the gun was more than twelve to eighteen inches away from Dewgard when he was shot. (A. 192).

### C. Tanella is Entitled to Supremacy Clause Immunity

As noted above, a federal officer is entitled to immunity under the Supremacy Clause if he had a subjective belief that his action was justified, and if such belief was objectively reasonable. *See Whitehead,* 943 F.2d at 234. Here, Tanella claims that he honestly believed that Dewgard was reaching for his weapon, and that he would have killed him with it. (Tanella 108–09). Based on that belief, Tanella thought that shooting Dewgard was justified.

### 1. Tanella's Subjective Belief

In order to sustain the subjective element of the necessary and proper test, the court must be satisfied that a federal officer "had no motive other than to do his job under circumstances as they appeared to him." *Long,* 837 F.2d at 744. Stated another way, the Supremacy Clause will not shield an officer who acted "out of malice or with some criminal intent." *McShane,* 235 F.Supp. at 273. Nor can an officer who "employs means which he cannot honestly consider reasonable in discharging his duties" claim the protection of the Supremacy Clause. *Clifton,* 549 F.2d at 728.

Earlier cases that considered immunity under the Supremacy Clause distinguished a federal officer's error of judgment from an act done wantonly and with criminal intent. The court in *In re Fair,* stated that in deciding immunity under the Supremacy Clause,

> it is not only proper, but necessary, for the court to determine whether the parties acted wantonly and with criminal intent, or whether their acts, though wrongful, were errors of judgment only. If they acted wantonly, with a criminal intent, then they were not acting within the scope of the authority conferred by the laws of the United States. On the other hand, if they acted without any criminal intent, but in an honest belief that they were only discharging the[ir] duties ... then their offense, if offense it was, was not against the laws of the state, and in such case the state has no jurisdiction.

100 F. 149, 155 (D.Neb.1900). Similarly, in *In re Lewis,* the court held that

> where an officer, from excess of zeal or misinformation, or lack of good judgment in the performance of what he conceives to be his duties as an officer, in fact transcends his authority, and in-

vades the rights of individuals, he is answerable to the government or power under whose appointment he is acting ... yet where there is no criminal intent on his part he does not become liable to answer to the criminal process of a different government.

83 F. 159, 160 (D.Wash.1897).

With these considerations in mind, it is manifest that the State has not put forth any evidence to undermine Tanella's subjective belief that his action was reasonable under the circumstance, or that he acted out of any criminal intent in shooting Dewgard. To be sure, the plan to arrest Dewgard went awry. The aim of the plan was to arrest Dewgard, and that is all Tanella was attempting to do. It is undisputed that Tanella was lawfully pursuing Dewgard and was attempting to effect an arrest, which he was authorized to do under the laws of the United States. It is also undisputed that until the shot was fired, Tanella's actions were consistent with the proper discharge of his duties. Tanella did not shoot at Dewgard's car while engaged in a high-speed chase. He did not shoot at Dewgard while chasing him down New York Avenue. Even after catching up to him, Tanella chose to engage in a dangerous hand-to-hand struggle in order to restrain Dewgard, rather than shoot him immediately. Were Tanella truly interested in stopping Dewgard at any cost he could have done so much earlier.[15] In all, the facts taken in the light most favorable to the State offer no basis for ascribing to Agent Tanella any criminal intent or any "motive other than to do his job under circumstances as they appeared to him." *Long*, 837 F.2d at 744.

### 2. The Reasonableness of Tanella's Belief

Turning to the objective reasonableness of Tanella's action, the State asserts that because Dewgard was about to flee,[16] Tanella's decision to shoot was unreasonable. However, the question of whether Dewgard was in fact about to run away is entirely irrelevant to the reasonableness of Agent Tanella's belief that Dewgard reached for his weapon. In this case, the proper focus of inquiry for Supremacy Clause purposes is whether Dewgard made a movement, not what that movement in fact turned out to be. If it is shown by the undisputed evidence that Dewgard made some movement, and if it was reasonable for Tanella to have perceived that movement as a threat to his life, he cannot be prosecuted for the shooting. It does not matter whether Tanella was correct in his perception, because proper application of the necessary and proper standard "does not require a [defendant] to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Clifton*, 549 F.2d at 728.

As noted above, the testimony of the civilian witnesses is hardly uniform. The accounts of the civilian witnesses vary in several important respects, including whether Tanella handcuffed Dewgard, whether they struggled on the ground, and which direction they were facing. At a trial these would be relevant to the credibility of the witnesses and to the accuracy of their stories. For purposes of the motion to dismiss, however, I cannot pick and choose which aspects of the stories to believe. Rather, I must accept all of them as true. That is, of course, impossible where

---

**15.** In fact, the State practically admitted that Tanella would have been more justified in shooting Dewgard earlier in the chase. *See* Transcript of Oral Argument, at 36.

**16.** The State assumes, as I must, that the witnesses' testimony indicates that Dewgard was about to escape or had taken steps to escape just before Tanella shot him.

a portion of one witness' testimony directly contradicts another's. Thankfully, I need not resolve these distinctions, because the facts that are disputed do not bear on the issue of immunity.

The testimony of the witnesses reveals that Tanella chased Dewgard, that he attempted to restrain Dewgard, and that Dewgard resisted all efforts to restrain him. It is also undisputed that the two were in very close proximity and were engaged in a violent hand-to-hand struggle, in which Dewgard was apparently gaining the upper hand. The civilian witnesses are also consistent in what happened in the moment before the shot was fired. They stated that Dewgard "tried to run," (A. 19–20), that he "turned to run," (A. 40, 126, 148), that he "looked like he wanted to make a fake move and run," (A. 80), and that he was moving his hands, (A. 107).[17]

This testimony reveals that immediately before being shot, Dewgard made some movement, which these witnesses interpreted as him trying to run away. That may be a reasonable inference. That also may be exactly what Dewgard was about to do. But this disputed issue of fact is not before me. Nor is it relevant to the resolution of Tanella's claim of immunity. I must decide if it was objectively reasonable for Tanella to have interpreted that very same movement in a completely different manner, even if his interpretation or perception was ultimately mistaken. *See Clifton*, 549 F.2d at 729; *Neagle*, 135 U.S. at 76, 10 S.Ct. 658.

My decision, therefore, does not require me to credit one version of what happened over another. There is simply no dispute, even assuming the State's version of the facts, that Dewgard continued to actively resist arrest until he was shot, and that the two men were in very close proximity throughout their struggle. That Dewgard's body was found between the two vehicles where the struggle occurred also supports a finding that Tanella's perception was reasonable, even if mistaken, because under those conditions an ambiguous movement might be more easily confused with a threatening gesture. By contrast, for example, were Dewgard found shot in the middle of the street or at some significant distance from Tanella, his claim that Dewgard's movement appeared threatening would be much weaker.

There is also no dispute that Dewgard was being investigated for trafficking in drugs and guns.[18] Thus, it was reasonable for Tanella to consider someone who was involved in that kind of dangerous criminal activity as an immediate threat, particularly when he knew that his gun was within easy reach. Tanella's perception was also informed by Dewgard's initial effort to escape law enforcement by ramming his vehicle into Detective Corcoran's, and then driving in a manner that placed the public at great risk of serious injury. Notably, even after abandoning his vehicle, Dewgard nevertheless made sure to take the bag containing the cocaine with him. That act, along with his continued resistance, demonstrates his intent to carry on his criminal activity. Finally, the forensic evi-

---

17. I note that Ms. Bobbit's testimony on this point is consistent with Agent Tanella's. She, too, stated that Dewgard leaned towards Tanella just before being shot. (A. 63). I do not rely on this testimony in reaching my conclusion, however. I merely point out that at least one of the civilian witnesses saw the same thing that Tanella claims to have seen.

18. The CI informed members of the task force that Dewgard had previously supplied him with 25 to 30 kilograms of cocaine, and that on the day before the shooting Dewgard expressed interest in purchasing guns. (A. 247, 249).

dence in this case chiefly concerns the issue of what Dewgard may have been doing when he was shot. In light of my ruling on the issue of reasonableness, and my finding that the issue of Dewgard's escape is irrelevant, the forensic evidence is of limited value. At the very least, however, Dr. Macajoux's findings are consistent with Tanella's version of events and do not undermine the reasonableness of his perception of Dewgard's action.

■ Thus, based on all of the factors discussed here, I find that it was reasonable for Tanella to perceive (or even misperceive) Dewgard's movement as reaching for his weapon. Accordingly, based on all the evidence presented, I hold that Tanella did no more than what was necessary and proper in the discharge of his duty, and he is therefore immune from prosecution.

### D. Tanella was Justified in Shooting Dewgard

■ In addition to its assertion that shooting Dewgard was unreasonable, the State also argues that shooting Dewgard was unconstitutional under the rule announced in *Tennessee v. Garner*, 471 U.S. 1, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).[19] In *Garner*, the Supreme Court held that the "use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Id.* at 11, 105 S.Ct. 1694. The Court held that the use of deadly force is a seizure under the Fourth Amendment, and that the use of such force to apprehend a suspect is permissible only if the reasonableness requirement of the Fourth Amendment has been met. *See id.* at 7, 105 S.Ct. 1694; *see also Heath v. Henning*, 854 F.2d 6, 8 (2d Cir.1988) (citing *Garner*).

Under this standard, a court must balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake" and determine whether, under the circumstances, "including the severity of the crime at issue, the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989). "It is not objectively reasonable for an officer to use deadly force to apprehend a suspect unless the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *O'Bert ex rel. Estate of O'Bert v. Vargo*, 331 F.3d 29, 36–37 (2d Cir.2003) (citing

---

**19.** Although the issue of the constitutionality of using deadly force typically arises in the context of civil damages suits, in this criminal prosecution the State seems to be arguing that (1) Tanella's act of shooting a fleeing suspect was unconstitutional, and (2) an unconstitutional act can never be necessary or proper for the performance of a federal duty. *See* State Memo, at 29.

There are two flaws with this reasoning. First, as discussed above, the standard for Supremacy Clause immunity does not take into account the constitutionality of the officer's act, and the State has offered no authority for its proposition to the contrary. Second, the Fourth Amendment standard for using deadly force to stop a suspect only has an objective element, whereas federal immunity requires both a subjective and objective showing by the officer. *See Heath*, 854 F.2d at 9 ("While the Fourth Amendment test does take into account the officer's knowledge ... its primary focus is on the attendant circumstances and the objective reasonableness of the officer's actions. There is no room for consideration of the officer's motives or intent under this standard ... and no requirement that an officer have acted with an improper motive in order to have acted unreasonably.").

Despite these deficiencies, I address the State's argument for the sake of completeness.

*Garner*). Reasonableness, in turn, is evaluated objectively "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight ... [and] without regard to [the officer's] underlying intent or motivation." *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865.

■ Where an officer uses deadly force during an arrest, the court must take into account the fact that "officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham,* 490 U.S. at 396–97, 109 S.Ct. 1865. The court's inquiry should be limited to "the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second decision to employ deadly force." *Salim v. Proulx,* 93 F.3d 86, 92 (2d Cir.1996). An officer may reasonably conclude that a suspect poses a threat that warrants the use of deadly force if "there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm." *Garner,* 471 U.S. at 11, 105 S.Ct. 1694.

■ Although the State's argument concerning the constitutionality of Agent Tanella's use of force does not require a lengthy analysis, a brief discussion seems in order. First, we should recall that Dewgard was being investigated for trafficking in drugs and guns. Agent Tanella observed Dewgard use his car to ram the vehicle of another officer and drive in a reckless manner at a high rate of speed. He then observed Dewgard nearly hit a pedestrian on the sidewalk, abandon his vehicle and begin running with a bag containing three kilograms of cocaine. Furthermore, Dewgard ignored repeated orders to stop, and engaged in a violent hand-to-hand struggle with an armed officer, after being warned repeatedly that he would be shot. In light of all these undis-

puted facts, it defies logic to suggest that Tanella's use of deadly force was unreasonable under the governing law.

By way of illustration, in *Salim v. Proulx,* 93 F.3d 86, 92 (2d Cir.1996), the Second Circuit held that it was reasonable for an officer who was engaged in a struggle with a 14–year–old to use deadly force "when the possibility that [the decedent] might gain control of the officer's weapon was imminent." In this case, Dewgard was physically larger, and, according to the State's witnesses, was getting the better of Agent Tanella. In the time preceding the shooting, he also displayed an unwavering single-mindedness to avoid capture at any cost. I simply cannot find that under the circumstances as they existed at the time, "no reasonable officer would have made a similar choice." *Lennon v. Miller,* 66 F.3d 416, 425 (2d Cir.1995).

The recent Ninth Circuit case of *Billington v. Smith,* 292 F.3d 1177 (9th Cir.2002), is also instructive. There, the court held that an officer was justified in using deadly force to apprehend a hit-and-run suspect who struck him several times while trying to escape arrest and had exhibited dangerous conduct prior to the struggle. The arrest attempt was made following a high-speed car chase, which ensued after Detective Smith observed the suspect driving in a reckless manner, almost causing a head-on collision. *Id.* at 1180. The suspect crashed into a curb and proceeded to engage in hand-to-hand combat with Smith after unsuccessfully trying to drive away. *Id.* at 1180–81. The suspect, who was larger than Smith, was overpowering the officer during the struggle and, according to Smith, tried to pry his service weapon out of his hands. *Id.* at 1181.

The court found that the factual dispute as to whether the suspect had his hands on Smith's weapon when Smith fired the shot

or whether Smith had pushed the suspect away from him at that moment was immaterial, because the circumstances were such that a reasonable officer would have perceived the suspect to be a significant threat to his own life. *Id.* at 1185. Smith had observed the suspect driving in a reckless manner, he had probable cause to believe that the suspect had been involved in a hit-and-run accident, and was struck numerous times by the suspect during the struggle. Thus, it was objectively reasonable for Smith to have made a split-second determination to use deadly force.

Undeterred by the facts in this case, the State makes several remarkable assertions. First, the State notes that Dewgard was unarmed,[20] and that he did not cause or threaten to cause serious physical harm to Tanella. *See* State Memo, at 25. If the inquiry were limited to the few minutes that Tanella and Dewgard engaged in their struggle, the State may have a point. But Tanella's knowledge of Dewgard was informed by much more than those few moments. In the time immediately prior to their altercation, Tanella saw Dewgard ram the car of a fellow officer, and personally experienced Dewgard's physical assault during his attempt to escape. Thus, Dewgard's ability and willingness to cause or attempt to cause serious physical injury to armed law enforcement officers was abundantly clear.

Next, the State proceeds on its fanciful journey with the preposterous statement that because Dewgard was being investigated for drug possession—a *non-violent crime*—Tanella had no reason to believe that Dewgard posed a threat of serious physical injury to anyone else. *See* State Memo, at 26. Apparently, it is the State's view that Dewgard's high-speed "Tour de Brooklyn," during which he almost struck a woman and her toddler walking on the sidewalk, was simply a scenic excursion. The State also claims that even if Dewgard was dangerous while in his car, that danger disappeared when he abandoned it.

Faced with these absurd assertions, the court is left to wonder whether the Kings County District Attorney truly wants to send the message that an individual who expresses interest in purchasing guns, and who drives and runs through the streets of Brooklyn with three kilograms of cocaine poses no risk of serious injury or other danger to the public. While this court will not speculate about the District Attorney's motives, one fact is clear. This type of ill-advised prosecution, if unchecked, will surely chill federal-state law enforcement cooperation on many fronts.

## V. CONCLUSION

In this case, on the record before me, I conclude that federal law bars the prosecution of a federal law enforcement agent who demonstrated restraint, sound judgment and courage in the proper exercise of his sworn duty to protect the public. Accordingly, defendant's motion is granted, and the indictment is dismissed with prejudice.

SO ORDERED.

**20.** The State has not shown, however, that Tanella (or anyone else) knew that Dewgard was unarmed.