State of NEW YORK, Appellant,

v.

Jude TANELLA, Defendant–Appellee.

No. 03–1589.

United States Court of Appeals,
Second Circuit.

Argued: April 21, 2004.

Decided: June 30, 2004.

Ann N. Bordley, Assistant District Attorney, (Leonard Joblove, Victor Barall, Assistant District Attorneys, of counsel), for Charles J. Hynes, District Attorney, Kings·County, Brooklyn, N.Y., for Appellant.

Adam S. Hoffinger (Robert A. Salerno, Bridget M. Fitzpatrick, of counsel), Piper Rudnick LLP, Washington, D.C., for Defendant–Appellee.

Wayne W. Schmidt, Law Office of Wayne W. Schmidt, Park Ridge, IL, for amicus curiae Americans for Effective Law Enforcement, Inc., in support of Defendant-Appellee.

Gene Voegtlin, Law Office of Gene Voegtlin, Alexandria, VA (James P. Manak, Glen Ellyn, IL, of counsel), for amicus curiae The International Association of Chiefs of Police, Inc., in support of Defendant-Appellee.

Before: McLAUGHLIN, SACK, SOTOMAYOR, Circuit Judges.

McLAUGHLIN, Circuit Judge.

The State of New York ("the State") appeals from a judgment of the United States District Court for the Eastern District of New York (Garaufis, *J.*), dismissing an indictment against Drug Enforcement Administration ("DEA") Agent Jude Tanella for manslaughter. In May 2002, Agent Tanella shot and killed drug dealer Egbert Dewgard in Brooklyn, New York, after a high-speed car chase and a violent one-on-one struggle.

The Kings County District Attorney filed criminal charges against Tanella; and a New York State grand jury then indicted him on one count of first-degree manslaughter. After Tanella removed the case to federal court, Judge Garaufis dismissed the indictment on the ground that Tanella was immune from state prosecution under the Supremacy Clause of the United States Constitution.

On appeal, the State asks this Court to reinstate the indictment for manslaughter and to remand to the district court for a jury trial on the question of immunity. Because Tanella established his entitlement to Supremacy Clause immunity as a matter of law, we affirm the district court's dismissal of the indictment.

**BACKGROUND**

I. *The Facts*

This case arises from a buy-and-bust drug operation in Brooklyn, New York, conducted by a New York Drug Enforcement Task Force. The field team assigned to the operation comprised DEA agents, including defendant Tanella, and detectives of the New York City Police Department ("NYPD"). The objective of

the operation was to arrest Dewgard, a reputed drug dealer and firearms trafficker. A confidential informant, who had previously bought substantial quantities of cocaine from Dewgard, arranged to purchase another three kilograms of cocaine from Dewgard as part of the setup.

On the morning of May 1, 2002, the field team was split into two groups to conduct surveillance of both Dewgard's residence and his place of business, a printing shop. One of the detectives and three of the DEA agents, including Tanella, monitored Dewgard's residence. The other group monitored Dewgard's printing shop. Everyone on the field team wore plain clothes, drove unmarked cars, and was armed. When Dewgard appeared at his shop, Tanella and the other three members of his group were ordered to join the surveillance there.

While at the shop, Dewgard spoke to the confidential informant and arranged to make a cocaine sale later that day at Dewgard's home in Brooklyn. The delay, according to Dewgard, was to give him time to pick up the drugs.

From his shop, Dewgard drove to a nearby apartment building where an unidentified man placed a large black plastic bag in the passenger seat of Dewgard's car. Special Agents Scott Herbel and Dennis Peterson (sharing a car) and Detective Edward Corcoran and Tanella (driving separate cars) followed Dewgard as he left the pick-up site. When Dewgard stopped at a red light, the officers used their cars to box in Dewgard's. Agents Peterson and Tanella activated their flashing red lights, and Agents Herbel and Peterson exited their vehicle to arrest Dewgard.

Nevertheless, ramming Detective Corcoran's car and driving at high speed onto the sidewalk, Dewgard managed to escape. Agents Peterson and Tanella sounded their sirens. Detective Corcoran initially led the pursuit, but because he had no siren, he pulled over and allowed the three agents to pass him. As Dewgard raced through the streets of a residential neighborhood, Peterson and Herbel lost sight of Dewgard, leaving Tanella alone to pursue him. During the high-speed chase, Tanella continually used his radio to apprise the other members of the field team of his location.

About three-quarters of a mile into the chase, Dewgard careened, for a second time, onto the sidewalk, where his car wedged between a telephone pole and a fire hydrant, narrowly missing a pedestrian who was pushing her three-year-old daughter in a stroller.

Dewgard jumped from his car and fled on foot carrying the black plastic bag. Tanella radioed the other officers and pursued Dewgard on foot. He was about twenty-five feet behind Dewgard. Tanella displayed his badge, removed his gun from its left-side holster, identified himself as a police officer, and shouted to Dewgard to stop. Dewgard continued running down New York Avenue. Tanella testified that, because he was behind Dewgard, he was unable to see if Dewgard was armed.

Dewgard finally stumbled and landed between a parked car and a parked van. He dropped the black bag, which was later found to contain three kilograms of cocaine. Tanella then caught up to Dewgard, who was still on the ground, and jumped on top of him. The two men struggled between the parked vehicles, with Dewgard continuing to resist arrest. At some point while they wrestled, Tanella fired one shot which hit the lower right portion of Dewgard's back and killed him. Within a minute, Agents Peterson and Herbel, who had lost contact with Tanella during the foot chase, arrived at the scene.

A search of Dewgard revealed that he had no gun.

Neither the State nor Tanella disputes the underlying facts of the buy-and-bust operation, the vehicular pursuit, the foot chase, or Dewgard's violent struggle to avoid arrest. Nor is there any disagreement that Tanella fired his gun and caused the death of Dewgard. The dispute centers on the relative positions of Dewgard and Tanella at the time of the shooting as well as on the reasonableness of Tanella's perception at that moment. The State claims that divergent eyewitness accounts at this critical, but narrow, temporal and spatial juncture require a jury trial to determine whether Tanella acted reasonably under the circumstances in the performance of his official duties as a DEA Agent. Because these divergent accounts form the basis of the State's position, we set forth, in some detail, the grand jury testimony.

*Tanella*

Tanella testified that he struggled to subdue Dewgard on the ground between the two vehicles. Unable to holster the gun in his left hand, Tanella tried with his right to defend himself against Dewgard, who was approximately four inches taller and twenty pounds heavier than Tanella. Tanella stated repeatedly that Dewgard was under arrest and ordered him to stop resisting. Dewgard responded, "[F]uck you, shoot me," and continued to punch Tanella in the face, side, and chest, while Tanella tried to "fend[ ] off blows" with his only free hand. As they struggled on the ground between the vehicles, Tanella asked the gathering crowd of onlookers to call 911. Immediately before the shooting, Dewgard pushed Tanella off balance onto his hands and knees. When Dewgard "look[ed] directly at [Tanella's] gun and [went] for [the] weapon," reaching for it in "a twisting motion," Tanella feared for his life and fired a single shot. Dewgard was an arm's length away from Tanella.

*Eyewitnesses*

Eyewitness Benjamin Shurin testified that he saw a police badge around Tanella's neck and a gun in his hand as Tanella chased Dewgard down New York Avenue. From "[o]ne or two feet" away, Shurin observed Tanella and Dewgard struggling on the ground, until Dewgard finally "managed to get up and tried to run." When pressed, Shurin stated that it looked as though Tanella "was trying to get up and hold [Dewgard] down." Once Dewgard stood up, Shurin heard a pop and saw both men fall to the ground in "the same place that they were," between the parked vehicles.

Eyewitness Edward John was in front of his house facing New York Avenue when he heard, " 'Don't move, stay down.' " John testified that he saw Tanella sitting on top of Dewgard and holding a gun in his left hand. Ignoring Tanella's warnings, Dewgard was "trying to get up" and pushed Tanella off of him. John observed Tanella "push [Dewgard] against a car and [hold] him there ... telling him, 'Freeze, don't move,' " while pointing his gun in the air. While Tanella held Dewgard against the car, John heard Tanella say, " 'I have a gun, I'm going to shoot you.' " Then, Dewgard "push [sic] from the cop and turned to run across the street, go across the street, and he want [sic] to make two or three steps away from the cop when the cop shoot [sic] him in his back." According to John, Dewgard and Tanella were "close up," "very close up" at the time of the shooting. John further testified that Dewgard fell "a good two, three steps from where the car [was] parked."

Synthia Bobbit also observed the chase on New York Avenue. Bobbit characterized Tanella as a "small built man" and Dewgard as "way bigger" than Tanella.

From "two car lengths" away, she saw Dewgard and Tanella "tussling" on the ground with Dewgard resisting all of Tanella's efforts to handcuff him. After Dewgard managed to stand up, Bobbit watched as Dewgard was "getting the best of" Tanella. Bobbit saw Tanella "jump[ ] away" from Dewgard, who "lean[ed] towards the cop, that is when the cop, he draw [sic] the gun back and he shot."

From a distance of "three to four feet away," Benjamin Murray witnessed Tanella and Dewgard "scrapping on the ground," with Dewgard trying to push Tanella off of him. Tanella was telling Dewgard, " '[D]on't move.' " Dewgard "looked like he wanted to make a fake move and run"—*i.e.,* "one of those moves like he [was] ready to run"—at which point Tanella "pulled the revolver out and shot him."

Barbara Gurly testified that she too observed Tanella chasing Dewgard, but at no time saw the men on the ground. She saw both men standing on the sidewalk, with Tanella trying to handcuff Dewgard and saying, " 'I'm gonna shoot you.' " According to Gurly, Tanella stood behind Dewgard, who was "trying to stand still but he didn't want the cuffs to go on his hand." Then, Tanella shot Dewgard. According to Gurly, the two men "were close, not far away from each other," possibly two-and-a-half feet apart, at the time of the shot.

Jewel Wallace testified that she was in her fifth-floor apartment but clearly heard someone shouting, " 'Stop, police.' " From her window, she saw two men struggling face-to-face, with Tanella holding Dewgard "up against the hood of the car" and Dewgard "trying to get him away." Wallace observed Dewgard "tr[y] to run, miss[ ] the step, then ... crumble[ ]" to the ground as a single shot was fired. Wallace also stated that Dewgard "turned to run" at the moment he was shot. Wallace testified that, at the time of the shot, both men were still between the parked cars, at "arm's length distance" from one another.

Finally, David Taylor testified that he saw two men "fighting on the car." From a distance of about seventy feet, Taylor witnessed Dewgard push Tanella away and "tr[y] to just turn around and run." At that point, while both men were standing upright, Tanella shot Dewgard "in his back." According to Taylor, Tanella shot Dewgard at "point blank range," or from a distance of approximately three to four feet.

*Forensic Evidence*

There was also testimony before the grand jury from Dr. Marie Macajoux, a forensic expert who examined Dewgard's body. She testified that the bullet entered the right side of Dewgard's back and traveled upward at a thirty-degree angle toward the front left portion of Dewgard's chest. According to Macajoux, two different scenarios were possible: (1) Dewgard was turning away from the shooter when the shot was fired; or (2) Dewgard was reaching toward the shooter and turned his body just before the shot was fired. Given the absence of soot or stippling on Dewgard's body, Macajoux determined that the muzzle of the gun was more than twelve to eighteen inches away from Dewgard when the shot was fired.

II. *Procedural History*

In October 2002, the State convened a grand jury in the New York State Supreme Court. After hearing the testimony of the task force agents, the eyewitnesses, and the forensic expert and being instructed on New York law, the grand jury indicted Tanella on one count of Manslaughter in the First Degree in violation of N.Y. Penal Law § 125.20(1), as follows:

The Defendant, on or about May 1, 2002, in the County of Kings, with intent to

cause serious physical injury to Egbert Dewgard, caused the death of Egbert Dewgard by discharging and causing to be discharged a loaded firearm, thereby inflicting various wounds and injuries upon Egbert Dewgard. And thereafter on or about May 1, 2002, Egbert Dewgard died of those wounds and injuries.

Tanella petitioned the United States District Court for the Eastern District of New York for removal pursuant to 28 U.S.C. § 1442(a)(1) (providing for removal of "criminal prosecution commenced in a State court against ... any officer ... of the United States or of any agency thereof ... for any act under color of such office ... for the apprehension ... of criminals"). Over the State's objections, the federal district court (Garaufis, *J.*) granted Tanella's petition. *New York v. Tanella,* 239 F.Supp.2d 291, 298 (E.D.N.Y.2003).

In March 2003, Tanella moved to dismiss the indictment under Federal Rule of Criminal Procedure 12(b). The issue was fully briefed, and oral arguments heard. Tanella argued that, as a federal law enforcement officer, he was immune from state criminal prosecution under the Supremacy Clause of the United States Constitution. The State argued that a jury should decide the issue of immunity in the course of determining Tanella's guilt. Content to rely on the testimony before the grand jury, the State declined the court's offer to hold an evidentiary hearing.

In addition to the grand jury testimony, two photographs were submitted to the district court. They depict the narrow space between the front of the car and the rear of the van where the struggle and shooting occurred. The photographs show a pool of blood on the street in the narrow space between the vehicles.

In September 2003, the district court granted Tanella's motion to dismiss the indictment with prejudice, finding that Tanella "did no more than what was necessary and proper in the discharge of his duty" as a federal agent and thus was immune from prosecution. *New York v. Tanella,* 281 F.Supp.2d 606, 623 (E.D.N.Y. 2003).

## DISCUSSION

This case requires us to "walk[ ] the fine line created between the goal of protecting federal officials acting in the scope of their duties and the obligation to avoid granting a license to federal officials to flout state laws with impunity." *Whitehead v. Senkowski,* 943 F.2d 230, 234 (2d Cir.1991). The task has been described as a delicate balancing act, and we are conscious of the care that we must exercise in undertaking it. *Id.; see United States ex rel. Drury v. Lewis,* 200 U.S. 1, 7, 26 S.Ct. 229, 50 L.Ed. 343 (1906).

Specifically, we must decide whether the district court was correct to dismiss the State's indictment against Agent Tanella pursuant to Rule 12(b). *See* Fed. R.Crim.P. 12(b)(2) ("A party may raise by pretrial motion any defense, objection, or request that the court can determine without a trial of the general issue."); *see also* Fed.R.Crim.P. 12(b) advisory committee's note (stating that "immunity" is a Rule 12(b) defense); *Kentucky v. Long,* 837 F.2d 727, 750 (6th Cir.1988) (holding that a defense of federal immunity is properly raised in a Rule 12(b) motion and decided before trial). Because this issue raises mixed questions of law and fact, we decide *de novo* whether Tanella qualifies for federal immunity under the Supremacy Clause. *See United States v. Gonzalez–Roque,* 301 F.3d 39, 44 (2d Cir.2002).

The Supremacy Clause of the United States Constitution declares that: "This Constitution, and the Laws of the United

States ... shall be the supreme Law of the Land ..., any Thing in the ... Laws of any State to the Contrary notwithstanding." U.S. Const. art VI, cl. 2. This clause is designed to ensure that states do not "retard, impede, burden, or in any manner control" the execution of federal law. *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436, 4 L.Ed. 579 (1819).

█ The Supremacy Clause has been held to protect federal officers from state prosecution under certain circumstances. As set forth in the seminal case of *In re Neagle*, 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890): "[I]f the prisoner is held in the state court to answer for an act which he was authorized to do by the law of the United States, which it was his duty to do as marshal of the United States, and if in doing that act he did no more than what was necessary and proper for him to do, he *cannot* be guilty of a crime under ... [state] law ...." *Id.* at 75, 10 S.Ct. 658. As such, the federal immunity defense ought to be decided "early in the proceedings" so as "to avoid requiring a federal officer to run the gauntlet of standing trial and having to wait until later to have the [immunity] issue decided." *Long*, 837 F.2d at 752. Indeed, by providing immunity from suit rather than a mere shield against liability, the defense of federal immunity protects federal operations from the chilling effect of state prosecution. *See Neagle*, 135 U.S. at 60–61, 10 S.Ct. 658 (observing that the United States "may, by means of physical force, exercised through its official agents, execute ... the powers and functions that belong to it" and that the Constitution requires state law to yield to the power of the federal government); *see also Tennessee v. Davis*, 100 U.S. 257, 262–63, 25 L.Ed. 648 (1879) (noting the need to prevent states from "paralyz[ing]" operations of the federal government).

█ No one disputes that Tanella was acting in his capacity as a federal DEA Agent when he shot Dewgard. Accordingly, we focus on the second prong of the *Neagle* test—namely, whether Tanella's actions were no more than was "necessary and proper" to carry out his duty. To meet this standard, two conditions must be satisfied: (1) the actor must subjectively believe that his action is justified; and (2) that belief must be objectively reasonable. *Whitehead*, 943 F.2d at 234; *see also Long*, 837 F.2d at 745 ("On the subjective side, the agent must have an honest belief that his action was justified. On the objective side, his belief must be reasonable."). A defendant, however, need not "show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be." *Clifton v. Cox*, 549 F.2d 722, 728 (9th Cir.1977). Thus, we must view all of the circumstances as they appeared to Tanella. *See id.* at 728–29; *United States v. Lipsett*, 156 F. 65, 71 (W.D.Mich.1907) (stating that a federal officer is "not liable to prosecution in the state court from the fact that from misinformation or lack of good judgment he transcended his authority").

In concluding that Tanella did no more than was necessary and proper, the district court found that: (1) there was no "evidence to undermine Tanella's subjective belief that his action was reasonable under the circumstance[s];" and (2) Tanella's belief that Dewgard was reaching for his (*i.e.*, Tanella's) gun was objectively reasonable in light of all the circumstances. *Tanella*, 281 F.Supp.2d at 621–23. In so ruling, the court concluded that "the facts that are disputed do not bear on the issue of immunity." *Id.* at 622.

On appeal, the State attacks the district court's rulings. As to Tanella's subjective belief, the State contends that a reasonable finder of fact could conclude that Tanella

did *not* actually believe that Dewgard was reaching for his (Tanella's) gun. As to the objective reasonableness of the shooting, the State argues that material factual disputes exist which a jury should resolve.

In reviewing this matter, we view the evidence in the light most favorable to the State and assume the truth of the allegations in the indictment. *See Boyce Motor Lines, Inc. v. United States,* 342 U.S. 337, 343 n. 16, 72 S.Ct. 329, 96 L.Ed. 367 (1952); *Morgan v. California,* 743 F.2d 728, 733 (9th Cir.1984). However, we are mindful that once a threshold defense of immunity is raised, the State bears the burden of "com[ing] forward with an evidentiary showing sufficient at least to raise a *genuine* factual issue whether the federal officer was ... doing no more than what was necessary and proper for him to do in the performance of his duties." *Long,* 837 F.2d at 752. Moreover, the State cannot meet its burden "merely by way of allegations." *Id.; see also City of Jackson v. Jackson,* 235 F.Supp.2d 532, 534 (S.D.Miss.2002) (stating that when a "Supremacy Clause immunity defense [is raised] by way of motion to dismiss, the district court should grant the motion in the absence of an affirmative showing by the state that the facts supporting the immunity claim are in dispute").

Because we hold, as a matter of law, both that Tanella honestly believed his life to be in danger and that his belief was objectively reasonable, we affirm the judgment of the district court.

## A. *Prior "Necessary and Proper" Case Law*

The defense of Supremacy Clause immunity from state prosecution has been recognized since the landmark case of *In re Neagle,* 135 U.S. 1, 10 S.Ct. 658, 34 L.Ed. 55 (1890). There, Supremacy Clause immunity was granted to David Neagle, a deputy United States Marshal, charged with protecting a Supreme Court justice who had been threatened by a dissatisfied litigant. While in the dining car of a train, the litigant approached the justice from behind and "struck him a blow on the side of his face, which was repeated on the other side." *Id.* at 53, 10 S.Ct. 658. Neagle shouted, " 'Stop! Stop! I am an officer!' " *Id.* The litigant then turned toward Neagle and "immediately turned his hand to thrust it in his bosom, as Neagle felt sure, with the purpose of drawing a bowie-knife." *Id.* At that moment, "Neagle fired two shots from his revolver into the body of [the litigant]," who was subsequently found to be unarmed. *Id.* Concluding that Neagle "did no more than what was necessary and proper for him to do," the Court held that he was "innocent of any crime against the laws of the State" and thus affirmed the issuance of a writ of habeas corpus. *Id.* at 75–76, 10 S.Ct. 658.

Applying *Neagle,* the Ninth Circuit in *Clifton v. Cox,* 549 F.2d 722 (9th Cir.1977), accorded DEA Agent Lloyd Clifton immunity from state prosecution for shooting a fleeing suspect in the back and killing him, in the mistaken belief that the suspect had shot Clifton's partner. *Id.* at 724, 730. In the moments leading up to the shooting, Clifton and his partner arrived outside the house of the drug suspect who was thought to be armed. *Id.* at 724. Clifton's partner tripped and fell at the same moment that Clifton heard a loud noise. *Id.* Believing that the suspect had shot his partner, Clifton forced his way into the suspect's house by kicking down the door, shouted "Halt" twice, and then shot the suspect as he fled into the woods. *Id.* The suspect was unarmed. *Id.* In affirming the grant of a writ of habeas corpus to Clifton, the court determined that Clifton lacked criminal intent and enjoyed federal immunity under the *Neagle* test, despite his error and

"even though his acts may have exceeded his express authority." *Id.* at 728.

In contrast, in *United States ex rel. Drury v. Lewis,* 200 U.S. 1, 26 S.Ct. 229, 50 L.Ed. 343 (1906), on which the State relies, the Supreme Court denied habeas relief based on federal immunity to two army officers because the government cited testimony which, if credited, would have defeated their immunity defense. *Id.* at 8, 26 S.Ct. 229 (noting the parties' concession that if the victim had surrendered, a fact which was in dispute, "it could not reasonably be claimed that the fatal shot was fired in the performance of a duty imposed by the Federal law"). Specifically, two eyewitnesses testified that an Army Lieutenant ordered one of his enlisted men to shoot a suspected thief. According to the testimony, the suspect, who had been fleeing, "stopped, turned around facing the pursuing soldier ..., threw up his hand, [and] said, 'Don't shoot,' 'I will come back,' or 'I will give up'"; but, "just then," the Lieutenant ordered the shooting. *Id.* at 4, 26 S.Ct. 229. Thus, the prosecutor's evidence showed that the unarmed suspect was not only standing at a distance with his hands in the air but was also orally surrendering when the Lieutenant ordered the enlisted man to discharge his firearm.

The State likewise relies on *Morgan v. California,* 743 F.2d 728 (9th Cir.1984), a habeas case in which the resolution of factual disputes was central to determining both whether the agents were acting within the scope of their duties and whether their actions were no more than was necessary and proper for the performance of those duties. *Id.* at 733. In *Morgan,* two

federal agents backed their car into a parked car. A dispute ensued, culminating in the agents' being charged with seven misdemeanor counts, including assault with a deadly weapon and displaying a gun in a threatening manner. *Id.* at 729–30. The court held that the agents were not entitled to federal immunity because it was "hotly disputed" whether they were intoxicated, whether they were acting within the scope of their duties, and whether the occupant of the parked car ever displayed a weapon, as well as several other material issues. *Id.* at 733–34 (internal quotation marks omitted).

B. *Application of the "Necessary and Proper" Test*

■ Reviewing all the evidence here, we find that no version of the events of May 1, 2002 proffered by the State removes Tanella from the ambit of *In re Neagle* and its progeny.[1]

1) *Subjective Component*

First, regarding Tanella's subjective belief, the State relies on eyewitness testimony that Dewgard was moving away from Tanella to demonstrate that Tanella did not actually believe that Dewgard was reaching for his (Tanella's) gun. The State focuses primarily on the testimony of Edward John in arguing that Dewgard "managed to get two or more steps away from [Tanella] when [Tanella] shot Dewgard in the back." Based on John's testimony, the State contends that Tanella unjustifiably shot Dewgard to prevent his escape.

1. We note that the Supremacy Clause immunity principles enunciated in the habeas context apply equally to a Rule 12(b) motion to dismiss an indictment in a case removed under 28 U.S.C. § 1442. *See Long,* 837 F.2d at 751–52 (finding the purpose of the habeas corpus provisions "much the same as the purpose underlying the removal provisions" and applying *Neagle* principles to a Rule 12(b) motion to dismiss based on Supremacy Clause immunity); *Whitehead,* 943 F.2d at 233 (describing the habeas and removal provisions in the Supremacy Clause context as "alternative[s]").

John's testimony that Dewgard was beginning to move away from Tanella, however, fails to raise a genuine issue of fact about Tanella's state of mind when he shot Dewgard. *See Long*, 837 F.2d at 744. Indeed, the testimony does not establish that Tanella "acted wantonly" or with "criminal intent." *In re Fair*, 100 F. 149, 155 (D.Neb.1900). Nor does the testimony suggest that Tanella had any "motive other than to do his job under circumstances as they appeared to him." *Long*, 837 F.2d at 744; *see also In re Lewis*, 83 F. 159, 160 (D.Wash.1897) ("[W]here there is no criminal intent on his part he does not become liable to answer to the criminal process of a different government.").

Even eyewitness testimony that Tanella said to Dewgard, " 'I'm gonna shoot you,' " is insufficient to establish criminal intent or improper motive under the circumstances. John, Barbara Gurly, and Jewel Wallace testified that at some point during the struggle, Tanella threatened to shoot unless Dewgard froze and submitted to arrest. Gurly also stated that there was a lag (of approximately four minutes) between Tanella's threat and the actual shooting. Regardless of how soon after making the threat Tanella fired his gun, however, his use of the standard police warning, "Stop, or I'll shoot"—whether made instinctively or to deter further resistance—is insufficient under these circumstances to raise a genuine issue of fact about Tanella's motive. *Cf. United States v. D'Amato*, 39 F.3d 1249, 1257, 1259–60 (2d Cir.1994) (finding insufficient *mens rea* for mail fraud because evidence was " 'at least as consistent with innocence as with guilt' " (quoting *United States v. Mulheren*, 938 F.2d 364, 372 (2d Cir.1991))). Nor, significantly, does the State highlight this testimony as evidence of criminal intent. In the absence of additional evidence, we conclude that the State has failed to cast doubt on Tanella's state of mind.

### 2) *Objective Component*

Second, as to the objective reasonableness of Tanella's belief, the State contends that the district court erred in taking from a jury the narrow factual question of precisely what occurred at the moment of the shooting. However, we are persuaded, as was the district court, that this factual dispute is immaterial to the reasonableness of Tanella's belief. *See Clifton*, 549 F.2d at 728 (granting motion to dismiss indictment where "resolution of [ ] factual conflicts" regarding when the suspect "took flight" was "immaterial to the resolution of the ultimate issue of whether petitioner employed means which he could consider reasonable in the discharge of his duty").

It is undisputed that, during the crucial moments immediately before the shooting, Tanella and Dewgard were struggling between two parked vehicles. Viewed in the light most favorable to the State, the witness testimony was that Dewgard "tried to run," "turned to run," or "looked like he wanted to . . . run" at the instant that Tanella shot him. The State also emphasizes the testimony of Edward John to support the proposition that "Dewgard was merely trying to run away" when Tanella killed him.

John testified that Dewgard actively resisted arrest and that he "push [sic] the cop and turned to run across the street, and he want [sic] to make two or three steps away from the cop when the cop shoot [sic] him in the back." Subsequently, he added that Dewgard "turn [sic] away from [Tanella], maybe three or four steps." According to the State's characterization, "John testified that Dewgard had taken two or more steps away from [Tanella] before [Tanella] shot Dewgard in the back." As a result, the State contends

that a jury should decide whether Tanella's justification for discharging his firearm was reasonable.

As noted earlier, we assume the credibility of the State's witnesses. *Cf. United States v. Shulman,* 624 F.2d 384, 388 (2d Cir.1980) (stating that "normally the resolution of issues of credibility is exclusively the province of the jury"). We decline, however, to credit the State's incomplete paraphrasing of witness testimony, except to the extent that a rational jury could do so.

We assume that a rational juror might accept the State's characterization that Dewgard was "two or more steps away" from Tanella at the moment he was shot, but we note that, in the same portions of the transcript, John testified that: (1) Tanella took out his firearm and shot Dewgard when Dewgard turned around and pushed him; and (2) Dewgard and Tanella were *in close proximity* when Tanella discharged his firearm. *See* Tr. of Grand Jury Testimony of Edward John, at 21 ("He was very close up to him."); *id.* at 22 (Dewgard and Tanella were "close up, very close up").

Accordingly, viewed in the light most favorable to the State, all that John's testimony suggests is that during the hand-to-hand struggle, Tanella discharged his firearm immediately after Dewgard pushed him, turned, and took a few steps, but that the two men remained in close proximity at all times.[2] As such, John's testimony and that of the other eyewitnesses do not raise a triable issue of fact on Tanella's entitlement to Supremacy Clause immunity.

To reiterate, the issue is not whether Dewgard was *actually* beginning to run, but whether Tanella's belief that Dewgard was about to grab his (Tanella's) gun was reasonable *from Tanella's viewpoint.* *See Long,* 837 F.2d at 745 (stating that immunity applies where petitioner "had no motive other than to discharge his duty under the circumstances *as they appeared to him* and that he had an honest and reasonable belief" that his actions were necessary and proper (quoting *In re McShane,* 235 F.Supp. 262, 274 (N.D.Miss.1964)) (emphasis added)).

An analysis of the testimonial evidence in conjunction with the undisputed surrounding circumstances compels the conclusion that Tanella's belief was reasonable. It is undisputed that Tanella knew Dewgard to be a seasoned drug dealer and Tanella experienced first-hand his violent efforts to avoid arrest. Tanella saw Dewgard drive recklessly to evade police capture and nearly hit a pedestrian and her child in the process. Dewgard further demonstrated his criminal tenacity by fleeing from an armed police officer while carrying a large bag suspected of containing three kilograms of cocaine, as well as by choosing to engage Tanella in a fist-fight rather than submit to arrest. It is clear that the close-quarter situation was hardly conducive to detached deliberation; any reaction by Tanella was necessarily made on a split-second basis. Under these tense and perilous circumstances, Tanella's perception that Dewgard was reaching for his (Tanella's) gun was objectively reasonable as a matter of law. *Cf. Graham v. Connor,* 490 U.S. 386, 396–97, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) ("The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather

---

**2.** Based on John's testimony, the State approximated the distance between Dewgard and Tanella as "four squares"—*i.e.,* four courtroom floor tiles. As the district court pointed out, however, the exercise of counting floor tiles without giving the dimensions of such tiles has limited value. *Tanella,* 281 F.Supp.2d at 618 n. 8 ("[R]eferring to floor tiles, without at least stating the dimensions of one tile, leaves too much to guesswork.").

than with the 20/20 vision of hindsight .... allow[ing] for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving ....").

In sum, viewed in the light most favorable to the State, the witness testimony establishes no more than that Tanella fired his gun after Dewgard pushed him, turned, and took two or more steps away from Tanella. Given the circumstances surrounding the shooting, such evidence is insufficient to defeat Tanella's federal immunity defense that during the course of the close-quarter struggle he honestly and reasonably judged Dewgard's sudden movement to be an attempt to reach for his (Tanella's) gun.

We need not and do not decide that Tanella correctly evaluated the circumstances, but only that he honestly and reasonably perceived Dewgard as a threat to his life. *See Clifton,* 549 F.2d at 728 (noting that immunity "does not require [an officer] to show that his action was in fact necessary or in retrospect justifiable, only that he reasonably thought it to be"); *Lipsett,* 156 F. at 71 (stating that a federal officer is "not liable to prosecution in the state court from the fact that from misinformation or lack of good judgment he transcended his authority").

Because we hold that Tanella did no more than was necessary and proper in the performance of his official duties as a DEA Agent, Tanella is immune from state prosecution.

## CONCLUSION

The district court's holding that Tanella is entitled to federal immunity under the Supremacy Clause is hereby AFFIRMED.